**50 WEST BROADWAY ASSOCIATES, a limited partnership, Plaintiff and Appellant,**

v.

**The REDEVELOPMENT AGENCY OF SALT LAKE CITY, a public corporation of Salt Lake City, Salt Lake County, State of Utah; Todd–Lignell Company, a Utah partnership; Block 58 Associates, a Utah limited partnership, Redevelopment Site Partners, a joint venture; American Savings and Loan Association, a Utah corporation; Rich Baldwin and Associates, a Utah partnership; American Towers, Inc., a Utah corporation; Dee W. Christiansen; Clark–Leaming Property Management Group, Inc.; Burton M. Todd; E. Keith Lignell; Robert W. Naffziger; Waldemar Christiansen; Simon M. Christiansen; Martin J. Christiansen; Walter Christiansen; HCBC Limited; GLML Limited; Donald A. Wright; Duane A. Trossen; A.P. 3 Associates, a Utah limited partnership; AMSAL Service Corporation, a Utah corporation; Old Stone Bank of Providence, Rhode Island; Marine Midland Bank, N.A. of New York; First Federal Savings & Loan of Philadelphia, Philadelphia, Pennsylvania; Dime Savings Bank of New York; and Seattle–First National Bank of Seattle, Washington, Defendants and Appellees.**

No. 20313.

Supreme Court of Utah.

Dec. 20, 1989.

Carman E. Kipp, Salt Lake City, for 50 West Broadway Associates.

Arthur H. Nielsen, Mark H. Anderson, Richard K. Hincks, Salt Lake City, for Redevelopment Agency of Salt Lake City, Todd–Lignell Co., Block 58 Associates, American Towers, Inc., Dee W. Christiansen, Clark–Leaming Property Management Group, Inc., Burton M. Todd, E. Keith Lignell, Robert W. Naffziger, Waldemar Christiansen, Simon M. Christiansen, Martin J. Christiansen, Walter Christiansen, HCBC Ltd., GLML Ltd., Donald A. Wright, Duane A. Trossen, and A.P. 3 Associates.

Ted Boyer, Edwin C. Barnes, Salt Lake City, for American Sav. & Loan Ass'n and AMSAL Service Corp.

Bryce E. Roe, Salt Lake City, for Old Stone Bank, Marine Midland Bank, Dime Sav. Bank, First Federal Sav. and Loan of Philadelphia, and Seattle First Nat. Bank.

STEWART, Justice:

This is an appeal from a decree of the district court awarding 50 West Broadway Associates the use of 45 parking spaces to service the Valley Bank Tower Building on Block 58 in downtown Salt Lake City.[1] This protracted case grew out of a contract dispute between the Salt Lake Redevelopment Agency (hereinafter RA) and 50 West Broadway Associates in connection with the redevelopment of Block 58.

## I. FACTS

The facts were set forth with meticulous care in the opinion of the district court judge, the Honorable Bryant H. Croft, who presided over this difficult matter. We borrow liberally, and to a large degree verbatim, from Judge Croft's statement of the facts in his memorandum opinion. We set out the facts at greater length and in greater detail than we ordinarily would do

---

1. Valley Bank, the principal subsidiary of Utah Bancorporation, developed the property in question and is the managing partner of 50 West Broadway Associates. For the sake of convenience, Utah Bancorporation, 50 West Broadway Associates, Valley Bank, and the predecessors of Valley will be referred to collectively as "Valley."

to try to save further disputes from being spun off from this case, if that is possible.

The lawsuit grew out of a disagreement as to the meaning of a contract executed September 14, 1973, by and between Valley and RA. Prior to the execution of this contract, RA was organized pursuant to the Neighborhood Development Act of the State of Utah, and acting pursuant to its statutory authority, RA became involved in an urban renewal project which related to and affected properties in Block 58, which lies between 200 and 300 South Streets and Main and West Temple Streets in downtown Salt Lake City, Utah.

## A. Valley's Properties

Valley acquired a tract of land on the southwest corner of Block 58 and constructed a three-story bank building for use as a branch bank for Valley Bank, a part of Utah Bancorporation. A related corporation, Lakeland Development Corporation, also acquired by purchase in September, 1969, an L-shaped tract of land that bordered the bank property on the north and on the east. It had a 96.75–foot frontage on West Temple Street and an 87–foot frontage on 300 South Street. A portion of the northern leg of this parcel plays a prominent role in this litigation. Valley acquired the entire parcel for the purpose of future development. This property and others along 200 and 300 South Streets and along West Temple Street were deteriorating and somewhat blighted, and RA targeted the area for redevelopment and urban renewal.

RA employed real estate appraisers to appraise each of the properties in Block 58, except those fronting on Main Street and Valley's bank building. RA then sent written offers to purchase each of these properties for the highest appraised value. Each offer stated that unless the offer was accepted by a certain date, RA would commence condemnation proceedings against the owner. The property purchased by Lakeland was included in the appraisals, but Lakeland did not accept the offer, and RA began a condemnation action against it. Negotiations between the parties culminat-

ed in the execution on September 14, 1973, of the agreement that governs this case.

## B. September 14, 1973 Agreement

Under the terms of the agreement, Valley sold and RA purchased the north 76 feet of the Lakeland property fronting on West Temple (hereinafter "property B"), and Valley retained the south 20.75 feet of the West Temple frontage and all of the 300 South frontage (hereinafter "property A"). Pursuant to the agreement, RA paid Valley $244,616.25 for property B. The agreement noted that Valley's affiliates had agreed upon a common goal for the development of the Lakeland property, including an addition to the then-existing three-story bank building, and that development was to proceed in a manner compatible with the existing bank building and the intended redevelopment of Block 58. The agreement also noted that Valley's sale of part of its Lakeland property to RA could result in the loss of parking space necessary for the development of Valley's remaining land. The agreement stated that Valley was not adverse to, and wished to join RA in, the compatible development of Block 58.

The contract also recited Valley's intent to construct a high-rise building upon the retained portion of the land that faced 300 South. The contract fixed a deadline for the construction and stated that if Valley failed to meet that deadline, RA could buy the retained property for stated prices. Valley built its high-rise.

A crucial provision of the September 14 agreement related to Valley's right to parking spaces:

K. ALLOCATION OF PARKING

. . . .

2. If [Valley] constructs the improvements on Property "A" and "D", then [RA] agrees that it will allocate in areas reasonably accessible to said properties, that number of parking spaces, not to exceed 100 parking spaces, that are required by the then extant parking ordinance, etc., of appropriate government authorities and required for the construction and operation of a building having

81,000 square feet. [RA] shall not be required to allocate more parking units than the amount of parking units then required to obtain approval for the construction of a building containing 81,000 square feet.

The parking so allocated may be a part of a common parking area and subject to validation, credit, reasonable policing, regulation and limitation so long as such policing and regulation are not discriminatory as between occupants of the redeveloped area and employees, agents and patrons of [Valley]. If [Valley] fails to meet the provisions relating to submission of plans, evidence of financial ability, or construction of improvements pertaining to Property "A," this covenant shall terminate, and the provisions of Paragraph "E" shall govern.

This covenant is conditional upon [Valley] complying with the "Time Limits" contained in Paragraphs "E" and "G" herein. If [Valley] fails to meet any of the provisions relating to submission of plans, evidence of financial ability, or construction of improvement, this covenant shall terminate.

3. It is recognized that [RA] does not have final approval in relation to determination of, or waiver of, parking space requirements on additions to existing buildings or the construction of new buildings in Salt Lake City. [RA] will use its best efforts in securing the necessary agreements of, or waivers from Salt Lake City Commission, by permitting parking spaces constructed by [RA] or its redeveloper to be allocated to [Valley] for the purpose of meeting zoning requirements as a prerequisite to securing building permits to construct the two (2) floor addition to the existing structure on Third South and West Temple or the improvements to be constructed on Property "A."

The execution of the agreement was preceded by several months of negotiations between the parties and their counsel, with preliminary drafts prepared by Irving H. Biele, Esq., counsel for Valley, and William D. Oswald, Esq., counsel for RA.

## C. Main Street Owners

RA's redevelopment plans for Block 58 did not include any of the business properties along the Main Street side of the block. The owners of those properties formed an association called the Main Parking Mall. The association had constructed to the rear, or west, of their Main Street stores a public parking mall containing 160 parking places to accommodate their customers. This parking mall fell within the area of Block 58 which RA planned to redevelop. As a consequence, RA entered into a contract with Main Parking Mall and others on May 7, 1973. By this agreement, RA purchased for $524,500 the fee title in the parking mall and agreed with the owners that no contract would be executed with any parties selected by RA to develop the land in Block 58 which did not expressly provide for a guarantee to furnish at least 160 vehicle parking spaces to be included in the redevelopment plans. These 160 spaces were to be reasonably accessible and convenient to the public and potential customers of the Main Street stores at their rear doors. This agreement provided that these spaces could be publicly or privately owned and could be located above, below, or at ground level. These spaces were to afford the Main Street store owners parking facilities equivalent to those purchased by RA. These agreements in the contract have a bearing upon subsequent events which led to the filing of this lawsuit. Under the contract, there was no connection between the Main Street store owners' parking requirements under the zoning regulations and the parking spaces allocated.

## D. Todd–Lignell Contract

RA eventually acquired all the remaining acreage in Block 58 that was to be included in the redevelopment project. On July 15, 1977, RA entered into a contract for the purchase by Todd–Lignell Company, a partnership, of all the land so acquired, including property B, for private redevelopment. The purchase price was $2,500,000. The agreement stated that RA had furnished Todd–Lignell copies of RA's September 14, 1973 agreement with Valley and its agree-

ment with Main Parking Mall. The agreement further stated that Todd–Lignell, for itself, its successors, and assigns and every successor in interest in the property or any pertinent part thereof, agreed to comply with all the covenants, conditions, and guarantees contained in the two agreements. The agreement provided that the 160 parking spaces called for in the Main Parking Mall agreement would be constructed at the expense of Todd–Lignell. The agreement also stated that Todd–Lignell "shall comply with the provisions of Paragraph K" in RA's agreement with Valley. It does not appear that the agreement between RA and Todd–Lignell was recorded.

Pursuant to the terms of this agreement, RA executed a special warranty deed dated October 12, 1977, which conveyed to Todd–Lignell the property to be developed. The deed, which was recorded immediately after its execution, stated that the express conditions and covenants to which the property was subject were a part of the consideration for the land. By the "Fifth" paragraph of the deed, the grantee for itself and its successors and assigns and every successor in interest to the property, or any part thereof, agreed that it, in addition to meeting the applicable parking ordinance, would construct at its own expense 160 additional parking spaces in the parking facility to be constructed on the property in compliance with the RA–Main Parking Mall agreement.

No similar provision was included in the deed with respect to the spaces to be allotted by RA to Valley under the September 14, 1973 agreement. Subparagraph (e) to paragraph "Fifth" of the deed did state, however, that RA as grantor had "certain unvested interests" in portions of Lot 4 owned by Valley Bank Investment Co., as evidenced by the agreement of September 14, 1973, in which Valley agreed to convey to RA the subterranean and air rights to property owned by Valley "subject to certain conditions contained in the agreement." The deed provided that the covenants in paragraph "Fifth" would remain in effect without limitation as to time.

A provision in the deed also stated that RA would remain a beneficiary of all covenants which would run in RA's favor, regardless of whether RA remained an owner of any land to which such covenants relate. The deed also provided that in the event of a breach of the "Fifth" paragraph, RA could maintain an action to cure the breach.

As of the date of the trial in early 1983, several buildings had been built on the block. Along West Temple Street, north of Valley's bank building and contiguous to the 20.75-foot strip of land retained by Valley in its agreement with RA, the Sheraton Hotel building (now the Red Lion Hotel) was under construction, with a contemplated completion date in late 1983 and at a projected cost of some $40,000,000. Valley constructed a twelve-story structure costing about $10,000,000 with over 81,000 square feet, which fronted on 300 South Street, east of the corner bank building. It is connected to the bank building by an elevated walkway. The Valley Tower required 187 parking spaces under the city zoning law.

Defendant American Savings participated in the redevelopment project both as a developer and a major source of financing for the project. Defendants Old Stone Bank, Marine Midland Bank, Dime Savings Bank, First Savings and Loan of Philadelphia, and Seattle–First National Bank provided financing for the project, and all have security interests in the various structures built pursuant to RA's contract with Todd–Lignell. Each of the other named defendants acquired an interest in Block 58 and its redevelopment.

As the redevelopment proceeded, problems slowly began to surface. Todd–Lignell was selected as the developer at a meeting of the RA board of commissioners held May 23, 1977. At this meeting, Dr. Lignell stated that Todd–Lignell's lender felt it would be advantageous for the developer to build and own the parking, thereby eliminating the need for the city to provide the parking. Lignell also stated that the developer would require approximately 800 stalls. He concluded by stating, "I know there would be some extenuating circum-

stances with Valley Bank and maybe with others. We would build these."

On June 2, 1977, Irving H. Biele, counsel for Valley, wrote a letter to Dr. Lignell advising him of RA's agreement to provide sufficient parking spaces to accommodate the construction of a building containing 81,000 square feet and that certain cross-rights in relation to subterranean parking existed. Dr. Lignell responded, "[W]e are aware of certain agreements that exist between the Redevelopment Agency and your clients." Dr. Lignell added that the agreements had not yet been studied in detail but that the developers would do so and keep Biele "fully advised."

When a special warranty deed was drafted and executed some four months later, RA's commitment to provide Valley parking spaces was not specifically mentioned, although the 160 spaces provided for in the Main Parking Mall agreement was referred to. Nevertheless, it was apparent from a letter dated October 28, 1977, that RA's position was that Todd–Lignell was not required to provide any additional parking space above and beyond the 160 spaces required under the Main Parking Mall agreement.

On November 7, 1977, Biele wrote a letter to Oswald, RA's attorney. Biele advised Oswald that at a meeting a few days before, the developers expressed surprise at the fact that they had to furnish a number of parking spaces to Valley. Biele added that the matter might be of sufficient importance that a specific disclosure was required. In response, Oswald wrote that RA's contract with Todd–Lignell made specific reference to the parking allocation provisions in RA's contract with Valley. Oswald stated that the developer had been given a copy of RA's contract with Valley and had given a specific covenant that it would comply with the provisions of Paragraph K. Oswald further stated that RA's contract with the developer called for the developer to build a number of additional spaces beyond those which the city code would require. Oswald suggested that perhaps a misunderstanding at the meeting occurred when Valley suggested that the

developer was going to build Valley's parking, when in reality the contract provided that the developer would build some additional parking for RA, and that RA would then "allocate" some of that parking to Valley in the event Valley decided to build the new building. Oswald further stated that RA would use 100 parking spaces in the structure being built by Todd–Lignell to make up the loss of parking in the new building. Oswald stated that RA was aware of Biele's concerns and would insure that there was full compliance with the September 14, 1973 agreement.

The next exchange of correspondence between Biele and Oswald regarding parking occurred in April 1979. On April 3, Biele summarized his understanding as to what was agreed upon as Valley and Todd–Lignell went forward with their respective building plans. Biele concluded by saying that the architects would submit plans for Valley's building so that a determination could be made as to how many of the 100 stalls referred to in the contract had to be allocated by RA to Valley's high-rise. As soon as that was done, he and Oswald could advise their clients "as to the methodology involved for policing, validation, etc." Oswald responded that all parties recognized the advantages of having a parking complex and surface parking by Valley which could be integrated into a common parking plan so that after banking hours much of the surface and subsurface parking of the bank could be used subject to reasonable compensation for the evening activities planned by Todd–Lignell. Oswald also stated that all parties recognized that the city zoning department would be better accommodated regarding the 100-stall allocation if both parties tied the parking together on a joint use basis. He concluded by saying that once the drawings had been approved by RA and the City, Biele and the attorneys for Todd–Lignell could negotiate the necessary contracts for joint assessments and rights-of-way, "together with the operating decisions on the parking lot and the sharing of income."

After a meeting of representatives from RA, Valley, and the developer, one of Valley's representatives dictated an office

memorandum noting that Todd–Lignell had stated that it was to construct 180 parking stalls on a two-level basis. The memorandum recorded that Burton Todd had said the developer was in full agreement and understanding that 100 of these stalls were to be assigned to Valley's tower to provide the necessary parking ratio but that these were not "free stalls." The Valley representative noted that he had said it was not his intention at that time to agree with Todd's interpretation. The group agreed that the question of "free" parking versus "fee" parking be referred to Biele and Oswald to resolve.

### E. The Dispute

In a letter dated January 16, 1981, Biele told Oswald that he, Biele, had attended a meeting with the people developing the American Plaza, who were apparently quite surprised that Valley claimed 100 parking spaces in the development. Biele added, "We were surprised that they were surprised." Biele said RA had the duty to provide 100 parking spaces to Valley and that the present entry and exit could be broadened so there could be joint reasonable use of all of the parking area "as long as our tenants and customers are provided with the requisite parking space" and recommended planning to accommodate the parking requirements and to avoid litigation.

Oswald responded, saying Biele's letter raised "surprises indeed." Oswald asserted that all had been going well until a bank representative inferred that someone was going to build the bank 100 parking spaces for its exclusive use. Oswald stated that RA had represented to the City that RA was requiring the developer to build 160 public parking spaces above the code requirement and that the City, following a long established practice had allocated 100 of those public parking spaces to Valley for the sole purpose of permitting Valley to get its building permit and build a larger structure than it otherwise could. Oswald also stated that to the extent bank employees or invitees desired to use the public parking areas in Block 58 on the same terms and conditions as other persons us-

ing the public parking areas, they would be welcome, but that if the bank thought that either RA or the developer agreed to build the bank 100 parking spaces "for the bank's *exclusive use,* they have lost touch with reality." He further stated that RA now contended that Valley had received the 100–parking–space allocation when it received its building permit and that for the bank to read the September 14, 1973 agreement as a guarantee that someone would build $700,000 worth of exclusive parking for the bank "is a surprise indeed."

On January 26, 1981, Biele wrote a letter to RA, noting that at two prior meetings it became evident that RA and the developers did not intend to provide the parking which the agreement with Valley required. He mentioned being furnished a draft of an agreement dated December 16, 1980, purporting to redefine Valley's rights under the 1973 contract. Biele also stated that if RA believed there had been a misunderstanding about the contract, the mistake was mutual and Valley agreed to rescind the agreement and put the parties back in the status quo. He stressed that the primary reason and consideration for the sale of the land to RA was the guarantee by RA of the parking spaces. He stated that if RA intended to perform in accordance with its agreement, RA should make immediate allocation of 100 parking spaces for use by Valley and its tenants. Once Valley received the allocated spaces, Valley would consider contributing, under equitable arrangements, a portion thereof to the common pool for the use of the public through a validation system. An immediate reply was requested since it appeared that the developer planned to commence construction on property B, which had been conveyed by Valley to RA years before. Specifically, this referred to the commencement of construction of the Sheraton Hotel.

On February 5, 1981, Biele again wrote to Oswald, stating that it had been RA's original intent to issue a bond and build an underground parking garage to service the entire area. Biele stated that was why "you requested the subterranean and air intrusive rights." Biele further stated that

Valley had agreed to give RA the intrusive rights and to sell a portion of its property to RA in consideration for the 100 spaces and that the 100 spaces referred to in the contract must be allotted to Valley. He stressed that these parking spaces were not fictional, to be used only to mislead the zoning commission into thinking there were sufficient parking spaces for the tower building.

Valley recorded its September 14, 1973 agreement with RA on January 29, 1981.

The original condemnation action commenced in 1973 was finally dismissed, and Valley recorded a "Notice of Rescission and Offer to Restore" dated March 25, 1982.[2] Valley filed this action April 6, 1982, and recorded a *lis pendens*. On September 1, 1982, the ground-breaking ceremonies were held for the Sheraton Hotel, and on October 28, 1982, Valley filed a motion for an order to show cause why the construction of the Sheraton Hotel should not be enjoined. That matter was continued without date because a motion for an immediate trial was made, and the trial was set for January 31, 1983, by agreement of all counsel. Notwithstanding substitutions of counsel on both sides without court permission, the parties agreed not to delay the trial.

The complaint alleged six claims for relief, each seeking "cancellation of the agreement of September 14, 1973, and the return to [Valley] of the subject property."[3] The complaint asked that, in the alternative, Valley be awarded such further relief as was appropriate in the premises.

At the outset of the trial, the attorneys for both sides stated that notwithstanding their very recent appearance in the case, none requested a continuance of the matter raised in the motion because of the circumstances involved, i.e., the special trial setting, the need for a final resolution as soon as possible in lieu of injunctive relief, their belief in the court's reluctance to grant a continuance, and their preparation for trial during the intervening time. However, RA's attorney stated that from his review of the pleadings and case file, he considered the action to be one solely for rescission of the agreement between Valley and RA and that if the court granted any other relief that might create a conflict between him and any of the twenty defendants he represented, he would be compelled to withdraw as to all defendants. No counterclaims or cross-claims were filed by any of the defendants in this action. The trial court ruled that any relief granted would not include any adjudication of rights as between the defendants and that "if any such adjudication is required, it will have to be the subject of future litigation."

At trial, the parties took the same positions they previously had taken. Valley contended that the agreement should be rescinded and its property returned after Valley's return of the consideration so that Valley could develop its own parking on the returned property. Valley also contended in the alternative that it should be allocated 100 parking spaces under the agreement for its exclusive use without having to pay for such spaces. RA contended that the 1973 agreement contemplated only that the parking spaces would in essence be "phantom" parking spaces, the allocation of which was intended only to help Valley obtain building permits to build the Valley Tower, and that once the Valley Tower was constructed, the agreement was fully executed and neither RA nor the developer had any further obligation to Valley.

After a lengthy bench trial, the trial court entered a 48–page memorandum decision on March 24, 1983. The decision reviewed at length the testimony and the

---

2. RA accuses Valley of unseemly conduct in obtaining RA's acquiescence to the dismissal of the condemnation action which had been pending for years. We see no such implication and fail to see how RA was in any way disadvantaged in the subsequent suit by the dismissal of the condemnation action.

3. The complaint sought rescission of the contract on six alternative theories: (1) failure of consideration, (2) material breach of the agreement, (3) RA's inability to allocate 100 parking spaces or its impossibility to perform, (4) mutual mistake of fact or law, (5) detrimental reliance by Valley on the representations of RA, and (6) fraud.

documents received and discussed the rights and obligations of each of the parties. The decision did not resolve the dispute, however. After referring to "the extremes" espoused by each side, the judge directed the parties to undertake efforts to arrive at a reasonable resolution to the problem through negotiation. No such resolution occurred, and approximately a year later, the trial court entered a supplemental memorandum decision in which it awarded Valley 52 parking spaces and refused to allow the rescission of the agreement. Approximately six months later, the court entered a second supplemental decision, which made a few technical corrections in the first.

Valley appeals the trial court's second supplemental decision. In that decision, the trial judge found that Salt Lake City zoning ordinances required 129 parking spaces for a building of 81,000 square feet, the size of the Valley Tower. The trial judge also found that Valley had built 132 parking spaces on the surface and under the Tower and that of those 132 parking spaces, 48 were replacements for spaces that had existed previously for the Valley bank building but had been destroyed to provide for construction of the Tower. That left 84 parking spaces, as the court reasoned, which had been built by Valley and were available for use to meet the parking requirements imposed by zoning regulations for the Tower.

After taking the 84 spaces into account that Valley had built for itself, the court ruled that RA had to provide 45 additional parking spaces to Valley so that Valley would have the 129 parking spaces required by the zoning laws. The court directed that 45 parking spaces be provided from the common area parking in the parking plaza under Block 58. The court also ruled that Valley was not entitled to ownership of the parking spaces under the contract and that the spaces allotted would be subject to the same rental payments and validation, credit, and policing regulations as applied to parking for other tenants and users of the common area parking lot.

## II.  RIGHT TO RESCISSION

■ We first address Valley's argument that it is entitled to rescission of the 1973 agreement and to reinstatement of the status quo as it existed prior to that agreement. Specifically, Valley claims that RA's successors in interest should be compelled to convey property B to Valley even though part of a hotel now stands on it. Valley argues that construction of the hotel had not started when Valley's notice of rescission, complaint, and *lis pendens* were filed.

Valley did not pursue its claim with the timely diligence required by the circumstances, assuming without deciding that its claim for rescission had merit. The parties elected to move forward with the trial with an expedited trial, and Valley made no effort to seek an order halting the construction of the hotel during the trial. Consequently, construction of the hotel proceeded to completion. The trial judge ultimately ruled that there was no equitable basis for rescission of the contract.

Valley argues on appeal that the court should not have considered the construction of the hotel on the subject property because the construction itself was begun after the notice of rescission. Valley further argues that the existence of a multi-million dollar hotel on part of property B should not be a factor in this Court's decision with respect to Valley's theories of rescission. The argument is bold enough, but it is not persuasive. Clearly it flaunts the most basic principles of equitable jurisprudence.

■ To rescind a partially executed contract, the party seeking rescission usually must be able to place the other party in the same position that existed before the execution of the contract. *Erisman v. Overman,* 11 Utah 2d 258, 262, 358 P.2d 85, 87 (1961); *see also Horton v. Horton,* 695 P.2d 102, 107 (Utah 1984); *Coleman Co. v. Southwest Field Irrigation Co.,* 584 P.2d 883, 884 (Utah 1978); *Rosenthyne v. Matthews–McCulloch Co.,* 51 Utah 38, 43, 168 P. 957, 958–59 (1917). *See generally* 17 Am.Jur.2d *Contracts* §§ 512–14 (1964). "Generally, if the parties cannot be put

back in statu quo, a contract can be rescinded only where the clearest and strongest reason and equity imperatively demand it." 17 Am.Jur.2d *Contracts* § 514, at 998 (1964). That is not the case here. Alternative remedies do exist. Furthermore, it is clear beyond peradventure that the parties cannot be returned to the status quo ante. Beyond that, a damage award would, in the last resort, provide a sufficient remedy.

## III. VALLEY'S CONTRACT RIGHT TO PARKING SPACES

Valley asserts that under the plain language of the contract it is entitled to an allocation of 100 parking spaces. The trial judge ruled that Valley was entitled to only 45 parking spaces. The formula used by the trial court to arrive at that conclusion is discussed below. Valley challenges the trial court's findings of fact in support of its order awarding Valley 45 parking spaces on the ground that the findings are not supported by the evidence. Valley also contends that the plain language of the contract controls the issue in any event.

■ In contract actions, we defer to the trial judge on issues of fact, but not on issues of law. In *Kimball v. Campbell*, 699 P.2d 714 (Utah 1985), we articulated the standard to be used in the review of a trial court's interpretation of a contract:

A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent. If a trial court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard. However, if the contract is not an integration or is ambiguous and the trial court proceeds to find facts respecting the intentions of the parties based on extrinsic evidence, then our review is strictly limited.

699 P.2d at 716 (citations omitted); *see Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 90 (Utah 1988). Nevertheless, "[t]he findings

and judgment of the trial court will not be disturbed when they are based on substantial, competent, admissible evidence." *Car Doctor, Inc. v. Belmont*, 635 P.2d 82, 83–84 (Utah 1981). A trial court's findings cannot be made up out of whole cloth; substantial, competent evidence must exist that supports the findings, and when a finding of fact is not so supported, it must be rejected. *Porter v. Groover*, 734 P.2d 464, 465 (Utah 1987); *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 626 (Utah 1979). Furthermore, we are not bound by the trial court's classification of a finding of fact or a conclusion of law; we will make that classification ourselves. In this case, we deal primarily with a question of law in construing the contract at issue.

■ The critical language of the 1973 contract between Valley and RA is found in Paragraph K–2. The first paragraph of that section states: "[RA] agrees that it will allocate in areas reasonably accessible to said properties, *that number of parking spaces, not to exceed 100 parking spaces, that are required by the then extant parking ordinance ... and required for the construction and operation of a building having 81,000 square feet.*"[4] (Emphasis added.)

RA's obligation under the contract is clear and unambiguous. RA must allocate parking spaces required by zoning ordinances for the construction and operation of a building having 81,000 square feet or more. Thus, RA had the affirmative duty to allocate a number of parking spaces to Valley to be determined by two factors: first, in no event would the obligation exceed one hundred parking spaces; second, RA would allocate the number of spaces necessary to obtain zoning approval for a building having 81,000 square feet. The trial court found that the zoning ordinance required 129 parking spaces for an 81,000–square–foot building. It follows that RA's obligation to Valley is to provide 100 parking spaces.

The second paragraph of Paragraph 2–K gives content to the word "allocate." That word was not intended to provide for a

4. The complete text of Paragraph K–2 is quoted above in the recitation of the facts.

conveyance of parking spaces in fee simple. Rather, the language of the second paragraph grants what is in essence a license to use the parking spaces. That paragraph states: "The parking so allocated may be part of a common parking area and subject to validation, credit, reasonable policing, regulation and limitation...."   .

RA urges us to give deference to the lower court's ruling allocating 45 parking spaces to Valley.[5] Although RA asserts that the trial court's interpretation of the contract is supported by the evidence, there is in fact no evidence at all that supports that conclusion. The trial court simply decided to take into account parking spaces that Valley built for itself, 84, and deduct them from the zoning requirement, 129, for a building of 81,000 square feet to arrive at RA's contractual obligation, 45. However, that formula is not in the contract and neither party argued for it in the trial court. It is simply the result the trial court apparently deemed "equitable."

Nevertheless, it is the contract that governs this dispute. In truth, the trial court reached a compromise solution which it worked out on its own, apart from the contract language. The result may be a fair compromise, but it is not what the contract calls for. The formula the trial court constructed to determine the number of spaces the contract "allocated" to Valley took into consideration the parking spaces which Valley provided for itself on its own land, but that formula is without any basis in the contract.

The trial court's formula was based on the difference between the number of spaces that Valley built pursuant to its own business policies on its own land and the number of spaces required by the zoning ordinance for an 81,000-square-foot building. The trial court thus interpreted the phrase "that number of parking spaces, not to exceed 100 parking spaces" in Paragraph K–2 of the agreement to mean that the RA was responsible for providing only those spaces that Valley did not provide for itself. The natural extension of this conclusion would mean that if Valley provided all the parking spaces required by the zoning ordinance, RA would be obligated to provide none. There is simply no basis in the contract whatsoever to support that conclusion.

The evidence clearly supports the plain meaning of the contract. For example, RA's attorney at the time of negotiation of the contract, William Oswald, testified:

Q. If there was a requirement ... for less than 100 parking spaces, say 50 or 60, or 40?

Commissioners and chairman of the Redevelopment Agency from 1971 to 1973, testified:

Q. Do you know whether or not the Redevelopment Agency made any provisions for an extra 100 spaces to satisfy that allocation under the 9–14–73 agreement?
A. Well, they would be included in the number of parking spaces that we would build.
Q. How did you provide for them? I am totally at a loss as to how they were provided for?
A. Well, we planned enough parking spaces so that the hundred would be included. We figured we had enough parking spaces to cover the hundred for [Valley]; and 160 for Main Street and the parking spaces needed for the buildings to be built on the project.

The trial court stated in its original memorandum decision that RA's theory that Valley's parking spaces could be double counted with the 160 spaces allocated to the merchants was "entirely without merit or legal justification" and characterized RA's position as "extreme." We agree.

---

5. On appeal, RA has abandoned the extreme and unhelpful position which it took in the trial court, that the 100 parking spaces allocated to Valley were "phantom" spaces. RA contended that the purpose of the allocation in the contract was to assist Valley in meeting zoning requirements. RA also contended that the spaces could be double-counted with 160 spaces allocated to other merchants. RA's abandonment of this theory is well-founded. That strategy was at very best ill-conceived. Indeed, the attorney who negotiated the agreement for RA contradicted RA's theory of the case when he testified:

Q. And you agree that there is a contract with us to have available 100 spaces allocated to us?
A. For purposes of parking as you go in and apply for those.
Q. Not just for the paper, not just for paperwork with the zoning. They are supposed to actually exist?
A. Yes, *they are not phantom spaces.* They are actually constructed in the block.

[Emphasis added.] Mr. Conrad Harrison, who was a member of the Salt Lake City Board of

A. Then there would be no allocation. In other words, if they needed 20, they would be allocated 20. *If they built a building that needed 30, they could have 30.* But if they didn't need a hundred, there would not be a hundred. There would only be allocated what they needed to get a [building] permit to meet the existing city codes.

[Emphasis added.] On cross-examination, Oswald was asked:

Q. Let me ask it another way. Preliminarily, we have established it was reliable; reported to the zoning people at the time of the building permit application that besides some other parking, they had had allocated, they, the applicants, allocated by the agency, 100 spaces that would be counted in order to meet the code or requirements for parking?

A. Yes.

Q. On the day after the application was filed, they still had that right?

A. Yes.

Q. And a year after, they still had the right?

A. Yes.

Q. And today, they still have the right?

A. Yes.

Q. Where are the spaces?

A. The spaces are in the block.

Mr. Irving Biele testified that the "up to" clause in Paragraph K–2 of the agreement related only to building size. He stated:

I am stating merely what they stated and if the zoning reduced the number in relation to the square footage of our building, if we built a smaller building, then they would be required to only produce a smaller number of stalls.

The evidence clearly indicates that no formula was required for the allocation of the parking spaces between RA and Valley.

In sum, the trial court erred in construing the contract to mean that Valley was entitled to only 45 parking spaces. We hold that Valley is entitled to 100 parking spaces under the contract.

## IV. OWNERSHIP OF PARKING SPACES

▮ Finally, Valley asserts that the trial court erred in construing the contract to mean that Valley was not entitled to ownership of the parking spaces allocated to it by the contract. The trial court found that the spaces allocated under the contract to Valley were to come from the common parking area in the parking plaza built by RA or its redeveloper and were to be subject to validation, credit, reasonable policing, regulation, and limitation without discrimination as between occupants of the redeveloped area and the employees, agents, and patrons of Valley. Valley concedes that it would have to absorb its proportionate share of the cost relating to validation, credit, reasonable policing, and other regulation. Valley contends, however, that since the contract itself does not state that Valley must pay reasonable rent for the parking spaces, the contract conveyed an ownership interest in real estate to Valley.

The contract itself states that the parking allocated to Valley "may be a part of a common parking area and subject to validation, credit, reasonable policing, regulation and limitation so long as such policing and regulation are not discriminatory as between the occupants of the redeveloped area and employees, agents and patrons of [Valley]." While Valley correctly asserts that the agreement does not make provision for rental payments, neither does the agreement state that Valley is to own outright the parking spaces which are to be allocated to it. The clear implication of the contract language is to the contrary.

The trial court construed the agreement in the same manner:

The allocation of parking spaces to [Valley] herein does not entitle [Valley] to the exclusive use, control, assignment or management of the allocated spaces, but its rights therein shall be the same or equal to the uses of common parking areas by other occupants of said Block 58, and the employees, agents and patrons of [Valley].

This interpretation of the agreement is supported by substantial evidence. Harrison, the chairman of RA, Wall, the director of RA, and Oswald, the attorney for RA at the time, all testified that RA and the City would not have entered into the agreement had the agreement provided that the 100 parking spaces would be exclusively owned by Valley.

In conclusion, we hold that Valley is entitled to be allocated 100 parking spaces and that the same terms and conditions should apply to their use as the trial court imposed for the use of the 45 parking spaces it awarded. Thus, the 100 parking spaces are to be provided from the common parking area in the parking plaza built by RA or its redeveloper and will be subject to validation, credit, reasonable policing, regulation, and limitation without discrimination as between occupants of the redeveloped area and the employees, agents, and patrons of Valley. Such allocation does not entitle Valley to the exclusive ownership of the allocated spaces, but its rights therein shall be the same or equal to the uses of the common parking areas as fixed or determined by the conditions for other users.

Affirmed in part, reversed in part, and remanded for entry of a new decree.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.