883 P.2d 1343 (1994)
In the Matter of the ESTATE OF Clay T. BEESLEY, Deceased.
La Juana Jo BEESLEY, Appellant and Cross-Appellee,
v.
Helen HARRIS, Mary Louise Clark, Ruth Ann Anderson, and Michael Wayne Beesley, Appellees and Cross-Appellants.
No. 930458.
Supreme Court of Utah.
October 14, 1994.
*1344 Phillip L. Foremaster, St. George, for appellant David Nuffer, Lyle R. Drake, and E. Scott Awerkamp, St. George, for appellees.
David L. Watson, St. George, for Beesley Estate.
DURHAM, Justice:
La Juana Jo Beesley appeals from a judgment entered by the Fifth District Court following a bench trial. The court awarded La Juana one-half of her husband Clay Taylor Beesley's estate. The remaining heirs to Clay's estate  three nieces, Helen Harris, Mary Louise Clark, and Ruth Ann Anderson, and a nephew, Michael Wayne Beesley  cross-appeal a separate portion of that judgment which awarded La Juana certain specific *1345 items of property in addition to her one-half share. We affirm.
Clay and La Juana met in October 1985 when La Juana responded to a personal advertisement that Clay had placed in a magazine. Following La Juana's response, they began communicating with one another through letters and telephone calls. During that time, La Juana was living in Texas and working as a nurse's aid. She earned about $3.50 per hour. Clay was a Utah resident and a retired steelworker. According to the district court, Clay had "substantial possessions," which included commercial real estate, and several airplanes and automobiles, as well as investment and retirement income.
In January 1986, Clay flew one of his airplanes to Texas and met La Juana personally for the first time. Roughly five days after arriving in Texas, Clay asked La Juana to marry him. He asked her to quit her job and move to Utah. He also told her that if she would marry him, he would take care of her during the marriage and she would not need to work. La Juana agreed to marry Clay. A few days later, she quit her job and traveled with Clay to Utah.
On January 20, 1986, while they were in Utah, Clay asked La Juana to sign a premarital agreement. He obtained a form for a premarital agreement, made several changes, and asked La Juana to type it. La Juana typed the agreement, and they signed it before a notary public. Among other things, the agreement provided:
If the marriage lasts untill [sic] the death of Clay T. Beesley and the parties of this contract were living as husband and wife, then he agrees that La Juana Jo Daugherty's share of his estate shall be 50% of the estate. This provision shall not be changed as a result of the terms of any will that he may write.
La Juana understood that this provision limited her right to inherit from Clay. She nevertheless agreed to be bound by its terms. Clay did not make any threats to La Juana in connection with signing the agreement, nor did he force her to sign it. The district court found that La Juana had "signed the Agreement because she wanted to marry [Clay] and she thought that if she did not sign the Agreement no marriage would occur."
At the time she signed the agreement, La Juana knew that Clay owned an apartment complex, an airplane, and at least two vehicles. She also assumed that he had a modest retirement income. Any information she had, however, came from her personal observations. The district court found that La Juana had never inquired about Clay's assets, debts, income, or expenses prior to signing the agreement and that he had never volunteered any information to her. According to the court, "[La Juana] had no information as to the full extent of [Clay's] holdings at the time of the marriage." In fact, she did not learn of all his financial holdings until after his death. La Juana and Clay were married on January 27, 1986, in Texas. Both had been previously married.
During their marriage, La Juana worked in the home and at an airplane hangar in Hurricane, Utah, owned by Clay. She also assisted Clay in maintaining his commercial property and took care of his father so that Clay could work on their home in Hurricane. On April 16, 1986, Clay and La Juana signed the first of four postmarital agreements entered during their marriage. This agreement contained the following provision:
In the event Clay T. Beesley and La Juana J. Beesley are still married to each other and living togeather [sic] at the time of Clay T. Beesley's death, the [Hurricane hangar] and it's [sic] contents shall become the property of his wife, La Juana J. Beesley.
The second postmarital agreement, entered April 8, 1987, contained a similar provision covering a truck and a fifth-wheel trailer. On June 22, 1987, Clay and La Juana signed a third document with a similar provision purporting to transfer title to Clay's home in Hurricane to La Juana. Finally, in July 1987, they signed the fourth agreement, which stated:

*1346 Clay T. Beesley agrees that in the event that he is still married to [La Juana] J. Beesley and living with her at the time of his death, [property consisting of a trailer park in Price, Utah] shall be the sole property of [La Juana] J. Beesley and will not become part of his estate.
In each of these agreements, La Juana promised that in the event she and Clay divorced or separated, she would not claim any interest in the items of property.
Clay died intestate in an airplane crash on July 21, 1991. The district court found that Clay did not execute a will because he assumed the laws of intestacy would control the distribution of his estate, as limited by the premarital and postmarital agreements. At the time of his death, he owned approximately $2,000,000 in assets and had roughly $785,000 in debts. Clay's only other surviving heirs are his nieces and nephew.[1]
La Juana commenced this action in August 1991. In August 1992, she petitioned the district court to declare her the sole heir to Clay's estate. The nieces and nephew opposed the petition. They maintained that the premarital agreement limited La Juana to one-half of the estate and, as the only remaining heirs, they were entitled to the other half. They also requested that the court invalidate the four postmarital agreements for lack of consideration. Following a one-day bench trial, the district court ruled that the premarital agreement was valid and limited La Juana to one-half of Clay's estate. The court also upheld the four postmarital agreements. Shortly thereafter, the court entered findings of fact and conclusions of law along with a judgment awarding La Juana one-half of Clay's estate as well as the specific items of property covered by the four postmarital agreements. The court gave the balance of the estate to the nieces and nephew.
La Juana appealed, and the nieces and nephew cross-appealed. La Juana claims that the district court erred when it found the premarital agreement valid. She argues that the premarital agreement should be declared invalid and that Clay's entire estate should pass to her via intestate succession. The nieces and nephew, on the other hand, challenge the district court's conclusion that the four postmarital agreements are valid. They contend that the agreements lack consideration and therefore the property covered should fall within the intestate estate, in which they have a one-half interest.
We first address the validity of the premarital agreement. Although it is settled that prospective spouses may enter contracts concerning the disposition of property upon death or divorce, this court has not had occasion to address in any detail the requirements for invalidating such agreements. We therefore begin our analysis by outlining a few foundational principles. At their most basic level, premarital agreements are a type of contract and thus generally should be tested by ordinary contract principles. See Neilson v. Neilson, 780 P.2d 1264, 1267 (Utah Ct.App.1989); Berman v. Berman, 749 P.2d 1271, 1273 (Utah Ct.App.1988). Premarital agreements, however, differ from typical commercial transactions in at least one very important respect. Parties to premarital agreements do not deal with one another at arm's length. Unlike a party negotiating at arm's length, who generally will view any proposal with a degree of skepticism, a party to a premarital agreement is much less likely to critically examine representations made by the other party. The mutual trust between the parties raises an expectation that each party will act in the other's best interest. The closeness of this relationship, however, also renders it particularly susceptible to abuse. Parties to premarital agreements therefore are held to the highest degree of good faith, honesty, and candor in connection with the negotiation and execution of such agreements. See Newman v. Newman, 653 P.2d 728, 732 (Colo.1982); *1347 Button v. Button, 131 Wis.2d 84, 388 N.W.2d 546, 550 (1986). This principle is consistent with our limited case law concerning premarital agreements.[2] In Huck v. Huck, 734 P.2d 417 (Utah 1986), we noted in dicta that premarital agreements "concerning the disposition of property owned by the parties at the time of their marriage are valid so long as there is no fraud, coercion, or material non-disclosure." Id. at 419.[3]
La Juana raises two challenges to the agreement. First, she claims that the district court should have declared the agreement invalid because Clay failed to disclose to her the full extent of his financial holdings. Second, she argues that the court erred when it found she was not coerced into signing the agreement. We analyze these issues in turn.
La Juana maintains that the agreement should be invalidated because Clay failed to disclose his net worth before she signed the agreement. The district court specifically found that Clay made no effort to disclose his financial status. The court, however, declined to invalidate the agreement for lack of disclosure based on the following: (i) La Juana's lack of knowledge did not stem from Clay's failure to disclose but from La Juana's failure to inquire into the matter; and (ii) her lack of knowledge was immaterial because she was granted a percentage of the total estate rather than a specific sum and because the percentage she received was in excess of the amount she would have received pursuant to Utah's elective share statute. The nieces and nephew reiterate these same arguments on cross-appeal.[4]
In contract actions, we defer to the trial court on issues of fact but not on issues of law. 50 W. Broadway Assocs. v. Redevelopment Agency, 784 P.2d 1162, 1171 (Utah 1989). Consistent with this general rule, we will not set aside the district court's factual findings unless they are clearly erroneous. State v. Pena, 869 P.2d 932, 935-36 (Utah 1994); Scharf v. BMG Corp., 700 P.2d 1068, 1070 (Utah 1985). Establishing that a particular finding of fact is clearly erroneous requires the appellant to first marshal all the evidence in support of the district court's finding and then demonstrate that even viewing it in the light most favorable to the district court, the evidence is insufficient to support the finding. Scharf, 700 P.2d at 1070. The articulation of the proper legal standard for inadequate disclosure in the context of premarital agreements, however, is a question of law which we review for correctness. See Pena, 869 P.2d at 936 ("[A]ppellate courts have traditionally been seen as having the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction."). The application of a legal standard, once articulated, *1348 is a slightly different issue, one which involves varying degrees of discretion depending on the standard in question. Id. at 936-37, 938. The legal standard in the present case  the "materiality" of a failure to disclose one's financial status prior to executing a premarital agreement  is extremely fact sensitive, and reviewing courts should therefore give trial courts considerable discretion in determining whether the facts of a particular case come within this established rule of law. See id. at 937-39.
As indicated above, premarital agreements are valid provided there is no material non-disclosure in connection with their negotiation and execution. Huck, 734 P.2d at 419. This standard makes clear that failure to disclose each and every asset and liability will not automatically invalidate a premarital agreement. Instead, a court must first ascertain whether a party failed to disclose, and if so, it must then determine whether that failure was "material." In the present case, there was no disclosure whatsoever, and so the only remaining issue is whether Clay's failure to disclose was material. The district court incorrectly relied on the fact that La Juana did not seek out information concerning Clay's net worth as a basis for upholding the agreement. The duty to disclose in the context of a premarital agreement is an affirmative duty, and the failure to do so constitutes nondisclosure, regardless of the other party's actions.
While in most cases an outright failure to disclose would, by definition, be material, we agree with the district court that in the present case it was not. According to the district court, there was no evidence that La Juana would have done anything different had she been aware of Clay's net worth. Moreover, we agree with the district court that because the agreement provided her with a percentage of the estate rather than a specific sum, it is less likely that disclosure would have affected her decision to enter the agreement. Unlike the situation where a party contracts for a specific sum only to discover that it represents a small portion of the other party's assets, La Juana contracted to receive one-half of Clay's estate, whatever that estate turned out to be. To the extent Clay's estate turned out to be larger than La Juana had anticipated, this resulted in a windfall to her, not a loss. See Knippel v. Marshall & Ilsley Bank, 7 Wis.2d 335, 96 N.W.2d 514, 519-20 (1959) ("In the case before us the agreement provided the wife with an interest in one-third of the husband's estate, whatever it might be. Thus the larger the estate, the larger the benefit she would obtain. [The wife's] ignorance of the amount of [her husband's] wealth could have misled her into signing this agreement for an interest in a fraction of it only if she thought his estate was larger than it really was."). The district court also pointed out that her one-half interest in Clay's estate exceeded the amount she would be entitled to receive under Utah's elective share statutes.[5] All of these factors support the district court's conclusion that the failure to disclose in the present case was not material. This, combined with the fact that we must accord the district court some discretion in applying the legal standard for material nondisclosure, requires that we uphold the court's conclusion.
La Juana next argues that the district court erred when it concluded that she had not been coerced into signing the agreement. The district court found that Clay did not force or in any way coerce La Juana into signing the agreement. According to the court, her decision to sign the agreement was entirely voluntary. La Juana relies on the fact that she agreed to marry Clay, quit her job, and moved to Utah before Clay ever raised the issue of a premarital agreement. She claims that this, combined with the fact that Clay would not marry her unless she signed the agreement, constitutes coercion sufficient to invalidate the agreement.
In Andreini v. Hultgren, 860 P.2d 916 (Utah 1993), we reviewed the evolution of Utah's legal standard for duress and ultimately *1349 adopted the definition set forth in the Restatement (Second) of Contracts. Id. at 921. As explained in the Restatement, two types of duress may invalidate a contract: duress by physical compulsion and duress by improper threat. Id. (citing Restatement (Second) of Contracts, §§ 174-76 (1979)).[6] Although not specifically articulated, La Juana essentially claims that Clay's conduct amounted to an improper threat.
The district court's factual findings, however, are fatal to La Juana's argument. The court specifically found that La Juana knew and understood the contents of the agreement and that she agreed to be bound by its terms. According to the court, she signed the agreement "voluntarily" and "of her own free will." Again, to successfully challenge factual findings such as these, an appellant must first marshal all of the evidence that supports the findings and then demonstrate that even viewing it in the light most favorable to the district court, the evidence is insufficient to support the finding. Scharf, 700 P.2d at 1070. In her brief, La Juana makes no effort to marshal the evidence in support of the voluntariness findings; in fact, she does not even mention the district court's findings. Instead, she simply reargues the facts. This approach is inappropriate. The district court is in the best position to weigh conflicting testimony, assess credibility, and from this make findings of fact. An appellate court does not lightly disturb the verdict of a jury or the factual findings of a trial court. Saunders v. Sharp, 806 P.2d 198, 199 (Utah 1991) (per curiam); Oneida/SLIC v. Oneida Cold Storage & Warehouse, Inc., 872 P.2d 1051, 1052-53 (Utah Ct.App.1994). Accordingly, absent a proper showing, we will not revisit the facts on appeal.
Because La Juana has not properly challenged the district court's factual findings, we must presume that the evidence supports the findings and proceed to an examination of the court's "conclusions of law and the application of that law in the case." Saunders, 806 P.2d at 199; see Scharf, 700 P.2d at 1070; Shepherd v. Shepherd, 876 P.2d 429, 432 (Utah Ct.App.1994). As indicated above, the district court's factual findings undermine La Juana's legal argument. The court found that she signed the agreement "voluntarily" and "of her own free will." Furthermore, La Juana understood the meaning of the agreement, including the provision which limited her to one-half of Clay's estate, and she agreed to be bound by its terms. These uncontroverted facts necessarily establish that Clay did not coerce La Juana into signing the agreement. We therefore affirm the district court on this question.
Having concluded that the premarital agreement is valid, we must now determine what effect, if any, the agreement has on the laws of intestate succession. The district court ruled that it would be manifestly unjust to invalidate the agreement and allow La Juana to inherit the entire estate contrary to Clay's express wishes. The court, however, did not squarely address the manner in which the agreement interacted with Utah's intestacy statutes. We conclude that the agreement operated as a renunciation of La Juana's right to inherit one-half of Clay's estate through intestate succession.
Section 75-2-204 of the Code allows a spouse to renounce, by written contract, the right to receive property via intestate succession. This section states in pertinent part:
Unless it provides to the contrary, a waiver of "all rights" (or equivalent language) in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation or divorce is a waiver of all rights to elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation *1350 by each of all benefits which would otherwise pass to him from the other by intestate succession....
Utah Code Ann. § 75-2-204 (emphasis added). The agreement in this case was entered in contemplation of marriage and expressly limited La Juana to one-half of Clay's estate in the event he died while they were married. At the time she signed the agreement, La Juana understood that she was giving up her right to inherit one-half of Clay's estate. Although the agreement did not incorporate the language "all rights," the language used is substantially equivalent and effectively renounced La Juana's right to one-half of Clay's estate.
La Juana argues that the agreement, even if valid, cannot alter the law of intestate succession because it does not meet the statutory requirements of a will.[7] In essence, she claims that any agreement entered pursuant to section 75-2-204 must comply with the formalities for execution of a witnessed will.[8] These include signature by the testator, or in the testator's presence and at the testator's direction, along with the signature of two witnesses, each of which must be made in the testator's presence. See Utah Code Ann. § 75-2-502.[9] Section 75-2-204, however, does not incorporate the formality requirements for wills. The statute provides that rights "may be waived, wholly or partially, before or after marriage, by a written contract, agreement, or waiver signed by the party waiving after fair disclosure." Utah Code Ann. § 75-2-204. Nothing in this provision suggests incorporation of the formality requirements; indeed, the plain language suggests otherwise. Moreover, courts in other jurisdictions, when construing identical statutes, have concluded that spouses may waive or renounce statutory inheritance by signing a premarital or similar type of agreement. See City Nat'l Bank v. Tescher, 578 So.2d 701, 703 (Fla.1991) (husband waived homestead allowance by executing premarital agreement); In re Estate of Flasted, 228 Mont. 85, 741 P.2d 750, 754 (1987) (wife waived right to exempt property and homestead allowances by entering agreement with testator's brother); cf. Beaman v. Beaman, 119 Ariz. 614, 617, 583 P.2d 270, 273 (Ct.App. 1978) (recognizing that under Arizona law, spouses may waive claims against each other's estates by virtue of antenuptial agreement); Lebsock v. Lebsock, 44 Colo.App. 220, 618 P.2d 683, 685 (1980) (recognizing that under Colorado law, spouses may waive claims against each other's estates by virtue of antenuptial agreement); Coleman v. Estate of Coleman, 439 So.2d 1016, 1018-19 (Fla.Ct.App.1983) (recognizing that under Florida law, spouses may waive claims against each other's estates by virtue of antenuptial agreement). The agreement in this case was signed by La Juana prior to her marriage. As set forth above, the district court concluded that Clay's failure to disclose was not material and therefore satisfied the common law standards for disclosure. Fair disclosure, as contemplated by section 75-2-204, is consistent with the common law standards for disclosure in the context of premarital *1351 agreements. See Lopata v. Metzel, 641 P.2d 952, 956 (Colo.1982). Accordingly, because the agreement satisfies the common law standard, we find that it also satisfies the requirements of section 75-2-204.
Finally, construing the premarital agreement as a renunciation is consistent with the decedent's intent. According to the district court, Clay entered the agreement because he wanted to ensure that his heirs other than La Juana would receive one-half of his estate. He did not execute a will because he assumed the laws of intestacy would control the distribution of his estate as limited by the agreement. If we were to hold that the agreement has no effect on the law of intestate succession, our decision would frustrate Clay's intentions. See Utah Code Ann. § 75-1-102(2)(b) (important purpose of probate code is to "discover and make effective the intent of a decedent in distribution of his property").[10] We therefore hold that by executing the agreement, La Juana renounced her right to inherit one-half of Clay's estate through intestate succession.
The last issue we must resolve is whether the district court erred in upholding the four postmarital agreements. The court found that the agreements were supported by adequate consideration and that La Juana was entitled to the specific items of property covered in addition to her one-half interest in the estate. The nieces and nephew challenge the court's finding of adequate consideration. They claim that because La Juana had already given up her right to one-half of Clay's estate, "[s]he had no consideration to give for the post-marital agreements."
Postmarital agreements, like premarital ones, are generally subject to ordinary contract principles. See D'Aston v. D'Aston, 808 P.2d 111, 112-13 (Utah Ct.App. 1990). One of the cornerstone rules of contract law is that an agreement must be supported by adequate consideration. Resource Mgt. Co. v. Weston Ranch & Livestock Co., 706 P.2d 1028, 1036 (Utah 1985). Consideration is an act or promise bargained for and given in exchange for a promise. Id. Consideration may be found "whenever a promisor receives a benefit or where [a] promisee suffers a detriment, however slight." Gasser v. Horne, 557 P.2d 154, 155 (Utah 1976); see Sugarhouse Fin. Co. v. Anderson, 610 P.2d 1369, 1372 (Utah 1980); Dementas v. Estate of Tallas, 764 P.2d 628, 632 (Utah Ct.App. 1988). Whether a particular benefit or detriment may serve as consideration to support an enforceable contract is a question of law which we review for correctness. See Nationwide Mut. Fire Ins. Co. v. Watson, 120 Wash.2d 178, 840 P.2d 851, 860 (1992).
The agreements at issue in this case contain mutual promises in which both Clay and La Juana suffer a legal detriment. In each agreement, Clay promised to give La Juana certain items of property in the event they were married and living together at the time of his death. In making this promise, Clay relinquished his right to control the disposition of his one-half interest in the property. La Juana, on the other hand, promised Clay that if they were divorced or separated at the time of Clay's death, she would not make any claim to the items of property covered by the agreements. In doing so, La Juana surrendered any right she may have had in the property.[11] Both Clay and La Juana suffered a legal detriment in making these mutual promises. Furthermore, *1352 the nieces and nephew admit that at least one of the agreements is supported by adequate consideration because Clay entered it in lieu of paying La Juana $5000 for work she had done at the home and airplane hangar in Hurricane. The record further indicates that La Juana assisted Clay in maintaining the commercial property covered by one of the postmarital agreements. She also took care of Clay's father so that Clay could work on the home in Hurricane. All of these facts support the district court's conclusion that the postmarital agreements were supported by adequate consideration.
In sum, we affirm the district court's ruling that the premarital agreement signed by La Juana and Clay immediately prior to their marriage is valid and enforceable. La Juana was not coerced into signing the agreement, and Clay's failure to disclose was not material. By signing the agreement, La Juana renounced her right to inherit one-half of Clay's estate through intestate succession. We also affirm the district court's ruling that the four postmarital agreements were supported by adequate consideration. Those agreements had the effect of augmenting La Juana's one-half interest in Clay's estate.
The judgment of the district court is affirmed.
ZIMMERMAN, C.J., STEWART, Associate C.J., and HOWE and RUSSON, JJ., concur.
NOTES
[1] Clay had three natural children from a prior marriage, but all three had been adopted during Clay's lifetime. The district court ruled that they were not entitled to a share of Clay's estate. That ruling has not been appealed.
[2] It is likewise consistent with our case law on the effect of confidential relationships between contracting parties. See, e.g., Von Hake v. Thomas, 705 P.2d 766, 769 (Utah 1985) (benefiting party in confidential relationship bears burden of persuading fact finder that transaction was fair and not the result of fraud or undue influence); Cunningham v. Cunningham, 690 P.2d 549, 553 (Utah 1984) (same).
[3] Huck also made clear that "provisions eliminating the payment of child support or alimony in prenuptial agreements are not binding on the court." Huck v. Huck, 734 P.2d 417, 419 (Utah 1986). The agreement at issue in this case contained provisions that purported to relieve Clay from paying alimony in the event of divorce. Those provisions, however, have not been challenged, nor does La Juana argue that the entire agreement should be invalidated by virtue of their inclusion. Moreover, because Clay and La Juana were married at the time of Clay's death, the provisions relating to divorce do not apply.
[4] The nieces and nephew also argue that La Juana failed to introduce evidence at trial establishing Clay's net worth at the time of the marriage. They claim that in the absence of such a record, this court cannot determine whether Clay made an adequate disclosure to La Juana. While the nieces and nephew's argument raises an important issue, that issue is irrelevant in the present case. In many instances, it is critical for the court to determine the parties' net worth at the time of marriage. The only way a court can determine whether there was a material non-disclosure is to compare a party's net worth at the time of the marriage with the disclosure that party made prior to the marriage. In this case, however, Clay made no disclosure whatsoever. Given that fact, it is unnecessary to determine Clay's net worth at the time of the marriage.
[5] See Utah Code Ann. §§ 75-2-201 to -207.
[6] Because we ultimately affirm the district court on the ground that La Juana has not met her burden of challenging the court's factual findings, it is unnecessary to decide whether a different standard of duress may apply in the context of marital agreements.
[7] La Juana also claims that Utah's intestacy statutes preclude the nieces and nephew's claim to a portion of Clay's estate. She relies on section 75-2-102, which grants the surviving spouse the entire intestate estate unless there are surviving issue who are not issue of the surviving spouse. Utah Code Ann. § 75-2-102. She claims that because the nieces and nephew are not surviving issue, see id. 75-1-201(21), they cannot take by intestate succession from Clay. However, by signing the agreement, La Juana renounced her right to take one-half of Clay's intestate estate. By virtue of this renunciation, one-half of Clay's estate passes to his heirs next in line as though La Juana had predeceased Clay. See Utah Code Ann. § 75-2-801(3). The heirs next in line are the nieces and nephew. See id. § 75-2-103(3).
[8] The nieces and nephew claim that this issue was not raised before the district court and we should not consider it on appeal. Our review of the record, however, reveals that the issue was properly raised before the district court.
[9] A will that fails to comply with the formalities of section 75-2-502 may be valid as a holographic will "if the signature and material provisions are in the handwriting of the testator." Utah Code Ann. § 75-2-503. The agreement involved in this case does not meet the standards for a valid holographic will.
[10] We note that our construction of the premarital agreement is also consistent with the policies underlying section 75-2-204. The drafters of section 75-2-204 have articulated the purpose of that section as follows:

The right to renounce interests passing by testate or intestate succession is recognized by § 75-2-801. The provisions of this section, permitting a spouse or prospective spouse to waive all statutory rights in the other spouse's property seem desirable in view of the common and commendable desire of parties to second and later marriages to ensure that property derived from prior spouses passes at death to the issue of the prior spouses instead of to the newly acquired spouse.
Utah Code Ann. § 75-2-204 editorial board comment. This reasoning applies with equal force to Clay's desire to ensure that one-half of his estate pass to his closest surviving relatives.
[11] The nieces and nephew have not raised any issues concerning the enforceability of these promises in the event of separation or divorce, and we do not express any opinion on this subject. We also note that the nieces and nephew make only passing mention of the enforceability of the postmarital agreements in their brief, even though they raised this issue on cross-appeal. Clay's estate does not address the issue in its brief. Although we are able to decide this issue, in part due to the district court's detailed findings of fact and conclusions of law, we take this opportunity to remind counsel that it is incumbent upon them to provide the court with a meaningful analysis of the issues presented on appeal. See Utah R.App.P. 24(a)(9); First Sec. Bank v. Creech, 858 P.2d 958, 962 (Utah 1993); State v. Wareham, 772 P.2d 960, 966 (Utah 1990).