RANCH HOMES, INC., Plaintiff
and Respondent,

v.

GREATER PARK CITY CORPORATION, Defendant and Appellant.

No. 15467.

Supreme Court of Utah.

March 13, 1979.

---

5. See Footnote 2.

**622**

F. S. Prince, Jr., and Donald J. Winder, of Prince, Yeates & Geldzahler, Salt Lake City, for defendant and appellant.

Bryce E. Roe, Salt Lake City, for plaintiff and respondent.

HALL, Justice:

Defendant appeals from a judgment requiring it to respond in damages for breach of an option agreement.

The basic facts pertaining to the option are not in dispute. By the terms of the agreement, plaintiff paid defendant $10,000 for a seven-month option to purchase for the sum of $502,000 some 30 acres of land in Park City, Summit County, Utah. In the event the option was exercised, defendant was then to install, or cause to be installed, a paved roadway and various utility lines to the boundary of the optioned property. Plaintiff exercised the option in a timely manner, but thereafter the defendant repudiated the agreement to install the road and the other facilities, all of which prompted the initiation of this proceeding.

This case has been tried twice. The first trial resulted in a jury verdict in favor of plaintiff for sums designated as expenditures made in reliance upon the option and for lost business profits. For reasons not discernible from the record, the trial judge subsequently granted defendant's motion for a new trial.

The second trial was to the court, sitting without a jury. At the outset, the judge ruled, as a matter of law, that lost business profits was not a proper measure of damages in this case, but that reliance costs and expenditures, and the difference between market value of the land and the option price were. The trial went forward on that basis, however, plaintiff limited its presentation of evidence on the damage question to items of special damage claimed to have been incurred in reliance upon the contract.[1] The items of said special damages comprised two categories, the first being *actual* expenditures made and the second being obligations incurred, but as yet unpaid.

Plaintiff's evidence of its expenditures was supported by a photocopy of its check register and a series of cancelled checks corresponding thereto which appear in the

---

1. The only evidence of general damage was offered by defendant, to the effect that the market value of the land, due to market conditions then prevailing, was substantially lower than the option price.

record as Exhibits 5 and 6 and which total $24,982.41 and $2,587.39, respectively. We categorize said checks for convenience purposes as follows:

| | |
|---|---|
| $10,000.00 | paid to defendant for the option. |
| 5,000.00 | representing the total of several checks paid to James D. Fahs, Jr., plaintiff's president, and designated as "architectural and management fees." |
| 5,000.00 | representing the total of several checks paid to D. Michael Tuckett, plaintiff's vice president, and designated as "engineering and management fees." |
| 2,500.00 | paid to Grant S. Kesler, plaintiff's officer and legal counsel, designated as "legal services." |
| 5,069.80 | the composite sum paid to persons outside plaintiff corporation for various services consisting of logo and brochure design work, reproduction costs, marketing consultation, surveying, soil testing, architectural drafting consultation, sketches, and transportation. |
| $27,569.80 | Total |

Plaintiff's officers, Fahs and Tuckett, also testified as to their further services performed for plaintiff valued at $43,500, none of which had been paid. Specifically, the further services of Fahs were managerial and professional in nature. His managerial services were also referred to as "quarter-backing services," having to do with zoning and financing approvals and efforts to conform the proposed subdivision development with the master plan of Park City, while his professional services consisted of the preparation of *final* architectural plans for the development. All of his said services were valued at $17,500, computed on the basis of an anticipated annual salary of $30,000. Tuckett's further services were valued at $26,000 and consisted of the *final* engineering plans pertaining to all 104 lots

plaintiff contemplated by its subdivision of the land in question.

In contrast with the foregoing evidence of plaintiff's as to the reasonableness and the foreseeability of the expenses incurred, defendant's expert witness, Henry Traynor, established the industry standard for the steps to be taken by a reasonably prudent developer *after* obtaining an option but *before* exercising it. His testimony was *uncontroverted* and, in sum, consisted of the following: First, a developer must assure himself that the property can be rezoned, if necessary, for the intended use; and the expenditure of time consists of "a little leg work." Second, a preliminary plat may be required (at a maximum cost of $500) but no other "renderings, working drawings, architectural or engineering plans are needed until *after the option is exercised.*" With a preliminary plat, a developer should be able to get a commitment for financing but there is no need for any drawings of plans during the option period since "that's just too much expense to get into at this point." Third, a developer should get a preliminary estimate of costs which can be based on the preliminary plat. Fourth, if F.H.A. financing is desired, a verbal understanding is sufficient; and during the option period, it is premature to submit any plans to F.H.A.

Mr. Traynor further testified:

With the exception of whatever charge the engineer may have to work a—work out a preliminary plat and unless the community would require some sort of a filing fee, there shouldn't have to be any costs.

The trial court awarded judgment in favor of plaintiff totaling $42,587, plus prejudgment interest and the costs of both trials. The award includes the sum of $27,587 designated in the court's findings of fact as "expended in reasonable reliance upon the option agreement," and the further sum of $15,000 designated as "services performed through its officers." It is thus apparent that the trial court arrived at its award by merely "rounding off" and combining the totals of plaintiff's exhibits referred to *supra* and by reducing plaintiff's

claim of $43,500 for "officers' services" to $15,000.

Defendant's appeal challenges only to the propriety of the damages awarded and the imposition of interest and costs.

First addressing the issue raised as to the proper measure of damages, we conclude that the trial court committed no error in considering special, as well as general damages, as a proper measure of loss under the facts of this case.[2]

■ The term "general damages," as applied to the instant case, denotes those damages which in the usual course of things flow from the breach. They are of course limited to those resulting from the ordinary and obvious purpose of the contract, which in the case at hand would be the "loss of bargain" represented by the difference between the market value of the land and the option price. On the other hand, the term "special damages" denotes those damages which arise from the special circumstances of the case. They have been said to be such damages as, by competent evidence, are directly traceable to failure to discharge a contractual obligation.[3]

■ This Court has on numerous occasions noted the distinction between general and special damages and the applicability of each as a proper measure of damages.[4] We again reiterate that, in addition to general damages, one is entitled to recover those special damages which arise from circumstances peculiar to a particular case, provided they may be reasonably supposed to have been within the contemplation of the parties when the contract was made,[5] and provided further, that they are properly pleaded and proved.[6]

■ Applying the foregoing principles of law to the option agreement which is the subject of this case, it is obvious by the very nature of such an agreement that it was well within the contemplation of the contracting parties that certain relevant expenditures may be necessary and required on the part of the optionee in order to determine the feasibility of exercising the option.

We now turn to the matter of the propriety of the amount of damages awarded. The issue is not merely whether or not out-of-pocket expenditures and obligations were incurred in reliance on the option agreement as the plaintiff claims; rather, the real issue is whether or not said expenditures and obligations were reasonably foreseeable as a necessary consequence of the option.

■ The rule is that the damages to be awarded for breach of contract are those that are foreseeable as a natural and probable consequence of the breach.[7] In other words, the only damages recoverable are those that could be reasonably foreseen and anticipated by the parties at the time the contract was entered into. Mere knowledge of possible harm is not enough; the defendant must have reason to foresee, as a probable result of the breach, the damages claimed.[8] Furthermore, before reliance damages may be awarded, the amount of the expenditures must be found to have been *reasonably made*.[9]

2. See Restatement of Contracts, Sec. 330; McCormick on Damages, Sec. 8 (1935); and 22 Am.Jur.2d, Damages, Sec. 59.

3. *Bank of Commerce v. Goos,* 39 Neb. 437, 58 N.W. 84 (1894).

4. *Sprague v. Boyles Bros. Drilling Co.,* 4 Utah 2d 344, 294 P.2d 689 (1956); *Cohn v. J. C. Penney Co., et al.,* Utah, 537 P.2d 306 (1975); *Prince v. Peterson,* Utah, 538 P.2d 1325 (1975).

5. *Sitlington v. Fulton,* 281 F.2d 552 (10th Circuit, 1960).

6. *Security Title Co. v. Hunt,* 9 Utah 2d 67, 337 P.2d 718 (1959); *Prince v. Peterson,* supra, footnote 4.

7. *Pacific Coast Title Ins. Co. v. Hartford Acc. & Ind. Co.,* 7 Utah 2d 377, 325 P.2d 906 (1958).

8. Ibid.; see also, *Arctic Contractors, Inc. v. State,* Alaska, 564 P.2d 30 (1977); *Valley National Bank v. Brown,* 110 Ariz. 260, 517 P.2d 1256 (1974).

9. *Sprague v. Boyles Bros. Drilling Co.,* footnote 4, supra, wherein this Court held that costs incurred which resulted in a loss were allowed

Plaintiff urges upon us that the contract in question is not in the form of a "typical" option, but that it was a definitive contract relating to the development of a residential subdivision which, in and of itself, put defendant on notice that plaintiff intended to proceed with its plan of development during the option period. We view such as a concession that certain of the obligations it incurred were in fact in furtherance of its plan of development and not solely in reliance on the option itself.

 We are constrained to conclude from the terms of the agreement itself, that this case involves only an option, the very essence of which is that one party has the choice of exercising it or not while the other party has no choice; [10] and so long as it remains unaccepted, it is a unilateral writing that lacks the mutual elements required in a contract.[11] The particular nature of an option requires that the parties incur no more expenses than are absolutely necessary and that those expenses reflect only what is required to be done before the option can be exercised. If a breach occurs, the party at fault is liable only for those expenditures that could reasonably have been foreseen as a consequence of the breach and which were reasonably incurred by the innocent party.

It is only reasonable to keep costs at a minimum during the option period because until the option is exercised, no contract is in existence, even though liability may lie for breach of the option agreement.

Specifically in regard to the services of Fahs and Tuckett, it cannot be said that it was in any way foreseeable or necessary to expend $10,000 of their time and effort in ascertaining the feasibility of exercising the option. As the uncontroverted testimony indicated, that sum is far in excess of the reasonable cost of preparing a preliminary plat necessary to secure favorable zoning and financing and to estimate development costs.

As to the preparation of *final* architectural and engineering plans, also based on the record before us, not only were such unforeseeable, but totally unnecessary for any purpose *prior* to the time the option was exercised and would only become necessary if and when the property was purchased and actual construction of improvements begun.

In regard to the further award of $15,000 for the managerial and "quarter-backing" services of Fahs and Tuckett, such were rendered by them as plaintiff's officers in the performance of their normal corporate duties for which they should have been receiving salaries. These kinds of services are expected to be provided by an officer in the usual course of ongoing corporate activities and are not proper as an item of damage for breach here. Even if the services were performed in reliance on the option agreement, such reliance was neither reasonable nor foreseeable for the same reasons' discussed *supra*. A breaching party should not be additionally penalized for services performed by corporate officers in the daily management of the corporate body. If the corporation mistakenly believed it had to devote its time exclusively to premature preparations based on the option agreement, the defendant should not be held liable for what amounts to corporate bad judgment.

 Attorney's fees in the amount of $2,500 were included in the total damage award. The general rule on this point is that attorney's fees are not recoverable unless allowed by statute or contracted for by

as part of the damage provided they were required by the parties in the performance of the contract and as long as they were incurred "in the most economical way available." Certain expenses were denied because it was found the increased costs were not a loss as a result of the breach (thus the claimed expenditures had not been "reasonably made").

10. *Russell v. Park City Utah Corp.*, Utah, 548 P.2d 889 (1976).

11. *Williams v. Espey*, 11 Utah 2d 317, 358 P.2d 903 (1961); *Davenport v. Doyle Petroleum Corp.*, 190 Okl. 548, 126 P.2d 57 (1942).

the parties[12] unless, of course, equity permits otherwise.[13] In this matter, it would appear the legal fees may only be recovered if they were incurred as a natural and probable result of the option agreement.

The testimony of plaintiff's counsel was to the effect that his legal fees were for organizing the plaintiff corporation including the drafting of corporate articles, by-laws, minutes and stock certificates. This service was performed *prior to the execution of the option agreement.* No distinction was made between legal fees incurred before and after the execution of the option. The costs of incorporation or for providing legal services in the normal course of corporate business are inappropriate as part of a damage award for a breach of contract, especially when rendered before any negotiations of the option agreement· were entered into. To allow such an award to stand would set an undesirable precedent.

As to the expenditures made for the services of persons other than plaintiff's corporate officers (totaling $5,069.80), defendant directs no challenge thereto except for the $190.00 item designated as logo and brochure design. Consequently, we do not canvass the remaining items for propriety. For the same reason noted *supra,* we must agree that the cost of designing a logo and a brochure was neither foreseeable nor reasonable prior to the time the option was exercised.

Generally, it is the prerogative of the trial court to determine the facts and we will affirm when its determination thereof is supported by substantial evidence.[14] However, when a finding is so plainly unreasonable that no trier of the fact could fairly make such a finding, it cannot be said to be supported by substantial evidence[15] and the finding will be rejected as a matter of law, and the fact determined otherwise.[16]

Applying the foregoing principles of law to the facts and attendant circumstances of this case, we are constrained to conclude that the expenditures and obligations incurred by plaintiff to its three officers for their managerial, "quarter-backing," architectural, engineering and legal services (all of which totals $27,500) and the payment to third parties for logo and brochure design ($190) were not reasonably foreseeable nor necessary on the part of a prudent developer. It was neither foreseeable, necessary, nor reasonable that such extensive expenses be incurred on the strength of an option alone, and they could not have been reasonably within the contemplation of the parties at the time the agreement was entered into. On the contrary, it would appear that they were incurred in furtherance of collateral transactions pertaining to plaintiff's incorporation and development of its proposed subdivision.

The defendant's remaining points on appeal have been duly considered and found to be without merit.

The judgment is affirmed, except the case is remanded to the trial court with directions to reduce the total damage award by $27,690. Costs to defendant.

ELLETT, C. J.,* and CROCKETT, J., concur.

MAUGHAN, Justice (dissenting):

For two reasons I dissent. First, the majority opinion states, as a general legal

12. *B & R Supply Co. v. Bringhurst,* 28 Utah 2d 442, 503 P.2d 1216 (1972); *Blake v. Blake,* 17 Utah 2d 369, 412 P.2d 454 (1966).

13. *Eastman v. Eastman,* Utah, 558 P.2d 514 (1976).

14. *Charlton v. Hackett,* 11 Utah 2d 389, 360 P.2d 176 (1961).

15. *Seybold v. Union Pac. R. Co.,* 121 Utah 61, 239 P.2d 174 (1951).

16. *Continental Bank & Trust Co. v. Stewart,* 4 Utah 2d 228, 291 P.2d 890 (1955).

* Chief Justice Ellett had acted in this case before his retirement, December 31, 1978, other factors resulted in its delayed release at this time.

proposition, that an option is not a contract but a "unilateral writing." I find no literature on the legal implications of unilateral writings, but I am concerned that our adoption of the phrase will be productive of mischief if it can be inferred that the rights of an optionee are markedly inferior to those of parties to a contract. An option for adequate consideration is universally regarded as a contract. Thompson[1] defines an option as "a contract by which the owner agrees to give another the exclusive right to buy property at a fixed price within a specified time." It is frequently described as a "unilateral contract" in the sense that the instrument is often signed by the owner only, the other becoming a party by paying the consideration and accepting the instrument.[2] It is true that the *exercise* of the option creates *another* contract, but the relationship established by the option instrument is still a contract relationship, and the optionor's repudiation or breach subjects him to damages under principles of contract law.

Secondly, the majority holds—apparently as a matter of law—that an optionee is not justified in making significant expenditures in reliance on the promise of an optionor. An optionor's promise (as commitment made in a mere unilateral writing) is implied to be of lesser magnitude and sanctity, whatever the consideration for it, than promises made in contracts, and the optionee takes such promise seriously at his own risk.

The majority rejects the finding of the trial court that respondent acted reasonably and as contemplated in developing detailed, elaborate architectural and engineering plans in advance of option exercise. The trial court was obliged to find, says the opinion, that such preparation was "bad corporate judgment" because one of appellant's witnesses testified that such plans are "unnecessary" for purposes of presentations to lenders or zoning boards. In this connection, it is noteworthy that, as experts in

subdivision development, respondent's officers qualify at least as well as appellant's witness. They considered it prudent to develop detailed plans, and they made planning expenditures which were totally inexplicable except in the context of an intent to exercise respondent's option.

Without doubt, the question whether respondent's expenditures were reasonable and reasonably to have been contemplated was an issue of fact.[3] We do not properly substitute our findings for those of the trial court if there is competent and credible evidence to support the trial court findings.

In my view, the evidence that respondent acted responsibly during the option period in preparing for subdivision development of the optioned property is not only credible but compelling. To begin with, the total amount of preparatory expense (approximately $32,000.00) was about six percent of the purchase price stated in the option contract. If respondent had waited until the option was exercised to commence architectural and engineering work, it would have spent as much for interest during the succeeding six months as it spent for plans. It is a fundamental of subdivision development that the entrepreneur must act quickly after he incurs major loan costs to generate income. Any rational developer will complete all possible preliminary work before he incurs loan costs. It is principally for that reason that developers *use* option contracts. In this case, respondent gave itself seven months' lead time for that purpose.

It may be true that elaborate architectural renderings and engineering plans are not "necessary" for presentations to lending institutions and zoning boards, but it cannot be said consistently with common business experience that they do not *add* to such presentations. It is hardly credible, in fact, that a bank would lend even the land acquisition costs in this case without being assured of the economics of the project, and developers don't borrow just acquisition

---

1. Thompson on Real Property, Volume 8A, Sec. 4443; *Chournos v. Evona Inv. Co.*, 97 Utah 346, 94 P.2d 470.

2. *Keefer v. United Elec. Coal Companies*, 292 Ill.App. 36, 10 N.E.2d 836; *Whitworth v. Enitai Lbr. Co.*, 36 Wash.2d 767, 220 P.2d 328.

3. 5 Corbin on Contracts, § 1012.

costs, they finance development as well. Architectural and engineering work-ups are essential components of economic feasibility reports.

Respondent had, in this case, an additional business reason for preparing elaborate plans during the option period. Paragraph 11 of the Option Contract precludes respondent from constructing any improvements or buildings on the Option Property until appellant has approved the "detailed plans and specifications therefor" in writing. Prudence would dictate that the optionee under such a contract get assurance before exercising the option that his projected plans are acceptable. Delays in optionor approvals after exercise could be ruinous in terms of loan costs alone. It is almost inconceivable that appellant did not expect "detailed plans and specifications" to be prepared during the option period.

I cannot read the authorities cited in the majority opinion to support either of its premises to which I object. In my judgment, an optionee can rely on the promise of his optionor, and the reasonableness of his reliance is a question of fact as to which the findings of the trial court should be treated with enormous respect.

WILKINS, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.