Leon H. SAUNDERS; Robert Felton; Saunders Land Investment Corporation; White Pine Ranches; White Pine Enterprises; Kenneth R. Norton, d/b/a Interstate Rentals, Inc., Plaintiffs and Appellants,

v.

John C. SHARP and Geraldine Y. Sharp, Defendants and Appellees.

No. 880710–CA.

Court of Appeals of Utah.

Oct. 14, 1992.

Robert M. Anderson, Glen D. Watkins (argued), Bryce Wycoff, Hansen & Anderson, Salt Lake City, for Saunders, Felton, and White Pine.

Mark H. Anderson, Marilynn P. Fineshriber, Patricia L. LaTulippe, Nielsen & Senior, Salt Lake City, for appellees.

John B. Anderson (argued), Anderson & Holland, Salt Lake City, for appellant Norton.

Stanford B. Owen, Patrick L. Anderson, Fabian & Clendenin, Salt Lake City, for Surety.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

GARFF, Judge:

This case originated as an appeal from the trial court's ruling in favor of appellees John C. Sharp and Geraldine Y. Sharp, wherein the court ruled that appellants (collectively White Pine) breached the contract. White Pine appealed. This court affirmed in part, reversed in part, and remanded the case to the district court. *Saunders v. Sharp,* 793 P.2d 927 (Utah App.1990). On certiorari, the Utah Supreme Court agreed that the Utah Court of Appeals correctly affirmed the trial court's findings on the basis that White Pine failed to marshal the evidence. *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991) (per curiam). However, the supreme court, in its per curiam opinion, concluded the court of appeals erred when it "automatically affirmed" the judgment. *Id.* The supreme

court thereupon remanded the case to the court of appeals to specifically review the district court's interpretation of the contract and its conclusions of law. *Id.* at 200.

### FACTS

We reiterate the factual statement contained in the opinion of this court in the initial appeal based on the trial court's findings. *Saunders,* 793 P.2d 927, 928–30 (Utah App.1990). On November 9, 1980, White Pine, together with others not parties to this action, agreed to purchase 60.078 acres of unimproved real property (Property) in White Pine Canyon, Snyderville, Summit County, Utah from Sharps for the purpose of developing twelve to fifteen four- to five-acre residential lots.

At the closing of the sale on July 16, 1981, the parties executed a "Memorandum of Closing Terms" (Closing Memorandum), a Trust Deed Note of $963,055.30, a Trust Deed, and a Warranty Deed (collectively the Contract). Sharps' counsel prepared these documents. Appellants Leon H. Saunders, Robert Felton and Kenneth R. Norton executed the Contract for the buyers, and Sharps executed it for the sellers.

White Pine agreed to pay Sharps $1,583,055.30 for the Property, $620,000.00 of which was paid as a down payment at closing. Pursuant to the Trust Deed Note, White Pine agreed to pay Sharps the remaining $963,055.30 in five annual installments, in which the principal amount of each installment would be $192,611.06, in addition to accrued interest on the entire unpaid balance. At closing, Sharps conveyed fee title to the property to White Pine subject to the Trust Deed securing payment of the Trust Deed Note. The Trust Deed, by its terms, transferred title to the trustee, Associated Title, pending completion of the obligations of the Contract.

The Closing Memorandum noted

1. ... after recordation of the PUD [1] Plat and the Declaration of Covenants, Conditions and Restrictions, and upon receipt of each $140,000.00 in principal (but not including the earnest money and down payment money), Seller shall execute and deliver to Buyer a Partial Deed of Reconveyance for one (1) PUD lot.

2. Upon the payment of the release price, Buyer shall be entitled to the release of one (1) lot of Buyer's choice upon receipt of the payment or at any time thereafter.

3. It is agreed that at the time of execution of this Memorandum, Buyer has paid to Seller the sum of $620,000.00 which will release from the Deed of Trust three (3) PUD lots. Upon the recordation of the PUD Plat and Declaration of Covenants, Conditions and Restrictions with the Summit County Recorder, Buyer shall be entitled to the release from the Deed of Trust of three (3) PUD lots of Buyer's choice together with the said roadway.

The Closing Memorandum provided that it "may not be orally changed, modified, or terminated, except in writing, by the party against whom the same is sought to be enforced." In addition, the Trust Deed Note and the Trust Deed provided that White Pine would "pay at least 10 days before delinquency all taxes and assessment affecting said property." These documents also contained provisions relating to the payment of attorney fees under specified conditions.

On June 30, 1982, White Pine paid Sharps an installment payment of $308,177.69 by check with a cover letter from Felton, who was also counsel for White Pine, stating, "Upon final plat approval, we will notify you to obtain the releases for the lots and the road as per the contract."

The following year, on June 28 and June 30, 1983, White Pine paid Sharps $178,165.23. The remaining portion of the June 30, 1983 installment payment was paid by check, which was returned for insufficient funds resulting in a default.

---

1. A "PUD" is a Planned Unit Development, a private residential development having some characteristics in common with a subdivision and condominium, but not necessarily subject to the Condominium Ownership Act, Utah Code Ann. § 57–8–1 (1990). *See Saunders,* 793 P.2d at 929 n. 2 for further definition.

On July 19, 1983, while the June 30, 1983 payment was still in default and prior to the recordation of a final plat, Felton wrote a letter to Jon C. Heaton, attorney for Sharps, in which Felton requested that Sharps release Lots 1 through 5 and the Roadway.

On September 23, 1983, a Notice of Default was filed pursuant to the Trust Deed on the Property for the default of the June 30, 1983 payment. White Pine cured the default on November 14, 1983 by tendering $118,397.39 to Sharps.

On November 18, 1983, Heaton sent a letter to his clients (Sharps) enclosing for their approval a proposed final plat. This plat, along with a Declaration of Protective Covenants (Covenants), was later recorded in Summit County. While Heaton's letter said nothing about an easement, it instructed Mr. Sharp that his signature "on the enclosed consent document only acknowledges your approval of [Mr. Saunders's] recording the plat and the [Covenants], copy here enclosed." Heaton's letter also noted

> By Hy Saunders' signature, which I will obtain to this letter prior to releasing your consent to the recordation of the subdivision plat, he agrees that you continue to have your right of approval with regard to how the southern portion of the property is platted.

Heaton placed a signature block at the bottom of the letter, prefaced by the words "Approved: By." However, Mr. Saunders never signed the letter, nor was it signed by any other appellant who signed the Trust Deed, the Trust Deed Note, and the Closing Memorandum. Heaton's letter noted that Mr. Saunders intended to seek a "release of Lots 1 through 5 of the platted subdivision along with the road." Heaton said he had "reviewed the payments under the Note" and found that Mr. Saunders "is entitled to those releases." Finally, Heaton stated that once the releases were made, "pursuant to your instruction we will insure that rights are reserved in [the Roadway] for access for the southern portions of the property purchased from you until your Deed of Trust is fully paid."

The proposed final plat enclosed with Heaton's letter platted only the northern portion of the Property into six PUD lots, leaving the southern portion (approximately twenty-seven acres) of the Property unplatted.

On November 21, 1983, Felton, in a letter to Heaton, rejected the idea of creating an easement in favor of Sharps along the Roadway and objected to the scope of the access rights proposed in Heaton's letter.

On or about November 23, 1983, Sharps executed a Consent to Record with respect to White Pine's plat describing Phase I of the project, which involved the north six lots and the Roadway. The plat and the Covenants, along with the Consent to Record, were recorded with the Summit County Recorder on December 23, 1983. The plat indicated that the internal Roadway was to be private, in contravention to Sharps' intent to have the Roadway dedicated to public use. The Covenants provided that easements over the lots and common area properties "are hereby reserved by Declarant [White Pine], together with the right to grant and transfer the same."

The remaining property abutting the Roadway to the south was not platted. The plat showed the existence and location of utility easements, including those for water lines, a water tank and water system, substantial portions of which were to be constructed on the unplatted property. White Pine advised Sharps it would plat the balance of the Property at a later time.

On November 23, 1983, Sharps authorized the recording of a Cancellation of Notice of Default relating to the June 30, 1983 payment.

On January 18, 1984, Sharps directed the trustee, Associated Title, to reconvey Lots 1 through 5, but not the Roadway, from the Trust Deed to White Pine. Sharps instructed that "[e]xcept for [Lots 1 through 5] all other portions of the property remain subject to the Trust Deed."

Associated Title did not prepare the reconveyance of Lots 1 through 5 until January 7, 1986. The reconveyance was recorded March 26, 1986, more than two years

after White Pine had tendered the funds for those lots. No explanation of the delay in preparing the reconveyance was provided at trial.

On November 30, 1984, property taxes of approximately $4,725.00 for Lot 6 and the unplatted property became due and payable. White Pine had paid only $1,515.24 of that sum. White Pine later became delinquent on taxes for 1985, 1986 and 1987. The Contract provided that White Pine pay such taxes at least ten days before delinquency.

White Pine paid the 1984 installment payment of $192,611.06. The following year, on June 27, 1985, Sharps received only a portion of the June 30, 1985 installment payment in the form of a check from Felton for $59,709.47.

On September 16, 1985, Sharps again recorded a Notice of Default and published Notices of Sale covering Lots 1 through 5, Lot 6, and the Roadway and all of the unplatted property. Sharps later admitted that they mistakenly included Lots 1 through 5 in the Notice of Default.

In a letter dated February 27, 1986, White Pine requested a release of 7.35 acres of the unplatted acreage.

On May 7, 1986, Felton sent a letter to Sharps noting that the buyers "were in a position to prepare and obtain approval of that plat [for the unplatted acreage] immediately."

The next month, White Pine defaulted on the final June 30, 1986 installment.

During these years, Sharps did not interfere with White Pine's attempts to market or sell the Property.

On September 4, 1986, the day before the scheduled Trustee's Sale, White Pine sued, claiming Sharps materially breached the Contract in that they never reconveyed the Roadway, Lot 6 or 7.35 acres of the unplatted property. White Pine sought specific performance of the Contract including release of Lot 6, the Roadway, and 7.35 acres of the unplatted property, as well as damages arising from Sharps' breach of the Contract. White Pine also claimed Sharps' failure to reconvey excused White Pine's

obligation to make further installment payments, and tolled the accrual of interest on the unpaid principal balance.

White Pine also obtained a temporary restraining order (TRO) restraining Sharps from conducting the Trustee's Sale. The TRO required a bond of $2,400.00. In a hearing held January 4, 1988, this court ordered that the bond be increased to $50,000.00 "to protect the Sharps for the payment of such costs and damages as may be incurred or suffered if the Sharps are found to have been wrongfully enjoined or restrained."

Sharps defended, claiming they were excused from reconveying this property because White Pine failed to request reconveyances, or alternatively, because the Consent to Record in effect reconveyed the Roadway. Sharps then counterclaimed alleging White Pine materially breached the Contract. Sharps sought a dissolution of the TRO and claimed damages for its wrongful issuance.

The district court rejected White Pine's claims ruling that White Pine materially breached the Contract by failing to pay property taxes for Lot 6 and the unplatted acreage on November 30, 1984. The court concluded that White Pine further breached the Contract by failing to pay the 1985 and 1986 installment payments. Because these breaches were "material, significant and continuing and were uncured when [White Pine's] releases were first requested," Sharps were excused from reconveying Lot 6, the Roadway and the 7.35 acres. The court found that any damages claimed by White Pine "are too remote, conjectural and speculative."

The court found that Sharps had substantially complied with all of their obligations under the Contract and were entitled to foreclose and sell Lot 6 and all of the unplatted property because of White Pine's failure to request and identify lots for reconveyance. The court based this conclusion on White Pine's actual practice, as well as a requirement of the Closing Memorandum, to "make specific requests for the release of specific PUD lots from the Sharps."

The court also concluded, in the alternative, that (1) Sharps' execution of the Consent to Record constituted substantial performance of any obligation to release the Roadway under the Closing Memorandum; (2) Sharps' refusal to reconvey Lot 6, the Roadway, and the unplatted acreage was done in good faith because they relied on the advice of their attorney, Heaton; (3) White Pine suffered no damages as a result of Sharps' failure to act; and (4) based on Heaton's letter, White Pine had granted an easement to Sharps over the Roadway for access to the unplatted property by the "mutual intent and agreement of the parties." The court concluded that "[a]ccess to the unreleased and unpaid for land was intended to be given to the [Sharps] in case of default."

The court found that except for $1,515.24 in property taxes paid on the unplatted acreage in 1984, "no taxes have been paid on the unreleased Subject Property subsequent to November 30, 1984 and including 1985, 1986 and 1987."

The court entered judgment against White Pine for $742,984.67 and ordered the property sold at a sheriff's sale.

White Pine timely appealed. This court affirmed in part, reversed in part, and remanded the case to the district court. *Saunders*, 793 P.2d at 934. On certiorari, the Utah Supreme Court remanded the case back to this court to review the district court's interpretation of the Contract and its conclusions of law. *Saunders*, 806 P.2d at 199–200.

## ISSUES

The questions of law before this court are (1) whether the Contract is ambiguous; (2) the extent of White Pine's liability for taxes, and whether such liability affects Sharps' obligation to release property; (3) whether the Contract requires Sharps to reconvey Lot 6; (4) whether White Pine is excused from making installment and interest payments on the unplatted property; (5) whether the Contract requires Sharps to reconvey 7.35 acres of the unplatted property; (6) whether the Contract requires Sharps to reconvey the Roadway; (7) whether White Pine is entitled to benefit of the bargain damages; (8) whether the court correctly disallowed evidence of construction interest; (9) whether either party is entitled to attorney fees incurred at trial and on appeal; and (10) whether the court acted within its discretion in issuing the TRO.

■ This court has already affirmed the trial court's findings of fact. *Saunders v. Sharp*, 793 P.2d 927, 931 (Utah App.1990). The Utah Supreme Court, on certiorari, has requested that this court review the district court's interpretation of the Contract and its conclusions of law. *Saunders v. Sharp*, 806 P.2d 198, 199–200 (Utah 1991) (per curiam). While we reaffirm the trial court's findings of fact, we note that where the trial court's "findings" are actually conclusions of law, we review them as such regardless of how they are captioned. *See 50 W. Broadway Assoc. v. Redevelopment Agency*, 784 P.2d 1162, 1171 (Utah 1989).

We first review the law regarding ambiguity. We then examine the law regarding partial release clauses and apply it to the court's legal conclusions. The application of these areas of law and the interpretation of the Contract involve conclusions of law, which we review independently. *Saunders*, 806 P.2d at 199–200.

## I. AMBIGUITY

■ Language in a contract is ambiguous "if the words used to express the intent of the parties are insufficient so that the contract may be understood to reach two or more plausible meanings." *Larson v. Overland Thrift & Loan*, 818 P.2d 1316, 1319 (Utah App.1991), *cert. denied*, 832 P.2d 476 (Utah 1992). Whether an ambiguity exists presents a question of law, which we review independently. *Id.* However, the "language of a contract is not necessarily ambiguous merely because a party urges a different meaning that is more in accordance with its own interests." *Id.*

■ If a contract is not ambiguous, we look only at the documents themselves and do not look at extrinsic evidence to determine the parties' intent. *Winegar v.*

*Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991). A trial court's construction of a contract is an issue of law, both at trial and on appeal. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985). Thus, we review as a matter of law whether the Contract is ambiguous and whether it required reconveyance of the various parcels of the Property. *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483, 486 (Utah 1989).

## II. PARTIAL RECONVEYANCE

■ Generally, specific performance "may be granted only if the parties' intent as to the essential terms of the agreement is clear." *Barnard v. Barnard,* 700 P.2d 1113, 1114 (Utah 1985). Where the agreement provides for partial release of a mortgage or trust deed on specific lots or parcels, "it has generally been held that the release provisions should be interpreted more strongly against the party required to give the release." *Sears v. Riemersma,* 655 P.2d 1105, 1107 & n. 1 (Utah 1982). Moreover, absent a provision to the contrary, in conditional sales contracts for real property which clearly provide for transfer of clear title to part of the property upon payment of specified sums as set forth in the contract, title must be transferred even when the request is made after the contract was in default. *Burroughs v. Garner,* 43 Md.App. 302, 405 A.2d 301, 308-09 (1979); *Leisure Campground & Country Club Ltd. Partnership v. Leisure Estates,* 280 Md. 220, 372 A.2d 595, 598-99 (1977); *Columbia Dev., Inc. v. Watchie,* 252 Or. 81, 448 P.2d 360, 361-63 (1968). That is, the payment of each installment vests the buyer with an interest in the parcel and creates a duty, on the part of the seller, to reconvey. This duty cannot be retroactively excused, even where the buyer subsequently defaults; "... it has no bearing upon the mortgagors' right to request a release for which full payment was made prior to default." *Burroughs,* 405 A.2d at 308-09; *Leisure,* 372 A.2d at 598-99; *Watchie,* 448 P.2d at 361-63. This is true even where the buyer has not yet platted or described the land, *Burroughs,* 405 A.2d at 308-09, and where buyer has defaulted on his or her obligation to pay taxes on the land. *Watchie,* 448 P.2d at 361-63.[2]

■ To sum up, in determining whether a court appropriately granted or denied specific performance, we consider whether the intent of the parties is clear as to the essential terms of the agreement; we construe partial release clauses more strongly against the seller; and, we consider whether, and at what point, the right to the release vested.

## III. FAILURE TO PAY TAXES

■ That having been said, we next consider whether White Pine's failure to pay taxes on November 30, 1984 and thereafter excused Sharps' duty to release. We acknowledge that the documents comprising the Contract must be construed together in light of their purpose. *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987); *Big Cottonwood Tanner Ditch Co. v. Salt Lake City,* 740 P.2d 1357, 1359 (Utah App.), *cert. denied,* 765 P.2d 1277 (Utah 1987).

■ Neither party disputes that White Pine was obliged to pay taxes on the property. Nor do they dispute that as of November 30, 1984, White Pine failed to comply with that obligation. However, Sharps claim, and the trial court concurred, that payment of taxes constituted a condition

**2.** Sharps cite *Watchie* for the proposition that facts and circumstances outside the contract should be considered when determining whether to order a seller to release land. In *Watchie,* the buyer had defaulted on payments of principle as well as taxes. *Watchie,* 448 P.2d at 363. The *Watchie* court noted that the "general rule" as to "whether such a covenant for partial release continues to be enforceable after a default depends upon the wording of the covenant and the facts and circumstances surrounding its execution." *Id.* at 362. In *Watchie,* the court interpreted language in the contract to mean that the buyer must be current on taxes before conveyance, not that a default on taxes absolutely and finally excuses seller from its duty to convey. The court essentially affirmed the release order based on the language of the contract: "the decree does require that all of the taxes on all of the property must be paid before the partial transfer of property occurs." *Id.* at 363. The court then ordered buyer to become current on taxes within sixty days, and it ordered seller to release the land in question. *Id.* at 364.

precedent to release of the land. On the other hand, White Pine claims this conclusion was legal error because the Contract did not specify that payment of taxes was a condition precedent.

Here, the Trust Deed Note and the Trust Deed provide that White Pine would "pay at least 10 days before delinquency all taxes and assessment affecting said property." Even when we consider this language along with the three paragraphs in the Memorandum regarding Sharps' release obligations, we see nothing conditioning Sharps' duty to release upon White Pine's making timely tax payments. Because this language is unambiguous, we consider only the documents themselves and do not look at extrinsic evidence to determine the parties' intent. *Winegar*, 813 P.2d at 108.

Sharps cite cases where courts have held that payment of taxes was a condition precedent to release. *Markowitz v. Republic Nat'l Bank*, 651 F.2d 825, 827 (2nd Cir. 1981); *City Bank Farmers Trust Co. v. Heckmann*, 164 Misc. 234, 297 N.Y.S. 592, 594–95 (N.Y.Sup.1937); *Clason's Point Land Co. v. Schwartz*, 262 N.Y.S. 756, 759–60 (N.Y.App.Div.1933). These cases are inapposite either because the underlying contract had a provision accelerating the mortgage for nonpayment of taxes, *Heckmann*, 297 N.Y.S. at 592–93; *Schwartz*, 262 N.Y.S. at 758, or because the "terms of the mortgage precluded [the buyer] from demanding the release of liens so long as [the buyer] was in default under the mortgage." *Markowitz*, 651 F.2d at 827.

The issue here is whether the language of the Contract specifies that payment of taxes is "requisite to enable the other party to carry out his part of the agreement" so as to excuse Sharps' duty to release. *Buckman v. Hill Military Academy*, 190 Or. 194, 223 P.2d 172, 175 (1950) (where buyer had made principle payment, seller required to release parcel).

Thus, while White Pine is nevertheless liable for taxes,[3] that liability in no way undercuts Sharps' obligation to release property which has been timely paid for pursuant to the Contract.

## IV. LOT 6

White Pine claims the court erred in concluding that Sharps' duty to release Lot 6 was excused by White Pine's nonpayment of taxes.

■ The court concluded that because White Pine's "material and continuing breaches of the parties' Contract preceded timely plaintiffs' requests for reconveyance of Lot 6 ... [Sharps] were not obligated to reconvey Lot 6." The breach referred to by the court was White Pine's failure to pay taxes on November 30, 1984. The court concluded that White Pine's duty to specifically request and identify lots for release was a condition precedent to Sharps' duty to release, and that the Closing Memorandum and White Pine's "actual practice" established this duty.

White Pine argues that as of November 30, 1984, the date of its failure to pay the taxes, Sharps had already breached by failing to timely reconvey Lots 1 through 5, the Roadway, and Lot 6. White Pine claims the court erred in concluding that Sharps' duty to convey would not arise until such time as it had platted the lot and requested it, and that a correct interpretation would fix the date of the duty to convey Lot 6 upon payment of the installment, in this case, June 30, 1984. This date arose well before White Pine's November 30, 1984 failure to pay taxes. Therefore, White Pine claims it was justified in withholding the tax moneys, and that it was excused from paying future installments under the Contract until such time as Sharps reconveyed.

The case of *Burroughs v. Garner*, 43 Md.App. 302, 405 A.2d 301 (1979) is on point. *Burroughs* involved a similar release clause where the buyers requested release after they had defaulted on the contract, but before the land had been fore-

---

**3.** As we discuss later, White Pine's liability for taxes is restricted to that incurred on Lots 1 through 6 and the Roadway.

closed. Unlike the immediate issue, which involves failure to pay property taxes, the buyer in *Burroughs* failed to pay principal, interest and taxes. *Id.* 405 A.2d at 305. After the default, buyers requested release of property for which they had already tendered payment. *Id.* at 305–06. The sellers refused to release on the basis that buyers had failed to plat the parcel and to request it prior to default. *Id.* at 307. The *Burroughs* court held that because no provision in the deed disallowed release subsequent to default, and because release was "contemplated to take place in the future[,]" buyer's entitlement to release vested upon payment. *Id.* at 308.

The *Burroughs* court relied on *Leisure Campground & Country Club Ltd. Partnership v. Leisure Estates*, 280 Md. 220, 372 A.2d 595 (1977). The court in *Leisure* held that "[n]either default nor institution of foreclosure in any way negates the fact that where full payment has been made, the mortgagor has, at the least, complete equitable ownership of the property, and the mortgagee has, at most, only bare legal title to it." *Id.* 372 A.2d at 598. In *Leisure*, the court also held that, so long as the contract specified that the buyer was to select the property to be reconveyed, failure to describe the property prior to foreclosure would not prevent enforcement of the release provision:

> But, when the lender agrees that whatever the borrower may choose or intend be released will be released, he also agrees that the lender's intention as to the particular part to be released will be considered the same as that of the borrower and he should not be heard to say otherwise. The tract chosen under those circumstances by the borrower *is* the tract intended.

*Id.* at 602–03 (quoting *Lambert v. Jones*, 540 S.W.2d 256, 259 (Tenn.Ct.App.1976)).

In the present case, the trial court concluded that the terms of the Contract and White Pine's practice created a requirement that White Pine must "specifically request and identify lots" for release. This conclusion is neither supported by the language of the Contract, nor by case law.

The only language in the Contract going to White Pine's duty to request and identify a parcel prior to release is the following: "Upon the payment of the release price, Buyer shall be entitled to the release of one (1) lot of Buyer's choice upon receipt of the payment or at any time thereafter."

In January 1984, Sharps instructed Associated Title to reconvey Lots 1 through 5 to White Pine. In June 1984, White Pine paid its annual installment of $192,611.06, more than enough to pay for Lot 6 ($140,000.00). Obviously, under the terms of the agreement, White Pine was entitled to release of Lot 6 when it made the 1984 payment, even though it had not requested it because this was the only platted lot not previously conveyed.

The trial court's interpretation misses the "crucial distinction between a vested entitlement to a release ... and mere conditions placed upon the formal execution of the release by the trustees." *Burroughs,* 405 A.2d at 309. Moreover, the Closing Memorandum specifies that White Pine is entitled to release of the property upon Sharps' receipt of the payment "or at any time thereafter." This language disallows an interpretation that a release requested after default would be dishonored.

We affirm the court's findings relating to White Pine's obligation to pay property taxes on Lots 1 to 6 and the Roadway. However, we reverse the court's conclusion regarding Sharp's duty to release Lot 6.

## V. EXCUSE OF FUTURE INSTALLMENTS

White Pine claims the court erred in holding it liable for unpaid installments. White Pine claims Sharps' failure to timely convey Lot 6 and the Roadway excused its withholding of those sums.

"Parties to a contract are obliged to proceed in good faith and to cooperate in the performance of the contract in accordance with its expressed intent." *Cahoon v. Cahoon,* 641 P.2d 140, 144 (Utah 1982). Thus, a "party cannot by wilful act or omission make it impossible or difficult for the other to perform and then invoke the other's nonperformance as a defense." *Id.*

On the other hand, when one party commits such a willful act or omission, such that it "materially impairs the contractor's ability to perform, [the other party] has the right to consider the contract at an end, to cease work, and to recover the value of the work already performed." *Wagstaff v. Remco, Inc.*, 540 P.2d 931, 933 (Utah 1975).

In like manner, "a party committing a substantial breach of a contract cannot maintain an action against the other contracting party ... for a subsequent failure to perform if the promises are dependent." *Rogers v. Relyea*, 184 Mont. 1, 601 P.2d 37, 41 (1979).

Courts have applied the obligation to proceed in good faith to installment contracts. *See, e.g., Darrell J. Didericksen & Sons, Inc. v. Magna Water and Sewer Improvement Dist.*, 613 P.2d 1116, 1119 (Utah 1980); *Wagstaff*, 540 P.2d at 933. In *Wagstaff*, the court acknowledged that "a mere delay of a month by one party in making a payment on a contract would usually result in damages only, but would not justify the other party in abandoning the contract." 540 P.2d at 933. The court noted that this general rule varied depending on the circumstances. *Id.* The court concluded that "where the failure to pay an installment as provided in a construction contract is such a substantial breach that it materially impairs the contractor's ability to perform, he has the right to consider the contract at an end, to cease work, and to recover the value of the work already performed." *Id.*

Not every minor failure justifies nonperformance and rescission of the contract. "It must be something so substantial that it could be reasonably deemed to vindicate the other's refusal to perform." *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975).

The Utah Supreme Court applied this principle to an installment contract wherein one party agreed to pay a plumber as work progressed. *McCarren v. Merrill*, 15 Utah 2d 179, 389 P.2d 732, 733 (1964). In *McCarren*, the court, noting that the defendant refused to make timely payments

as established by the contract, held that "the plaintiff was justified in refusing to complete it." *Id.*

▄▄▄▄ Whether a particular breach is material is a conclusion of law to be reviewed independently. *Didericksen*, 613 P.2d at 1119; *McCarren*, 389 P.2d at 733. More particularly, in installment contracts, courts look to the four corners of the contract to determine whether "the contract by its terms makes time of the essence" in completing a given duty. *Didericksen*, 613 P.2d at 1119; *McCarren*, 389 P.2d at 733.

▄▄▄ The essential question, as applied to this case, is whether Sharps' refusal to convey Lot 6 and the Roadway constituted a substantial breach of the Contract so as to materially impair White Pine's ability to perform and thus to justify White Pine's abandonment of the Contract, *Wagstaff*, 540 P.2d at 933, or whether Sharps rendered "it difficult or impossible for [White Pine] to continue performance and then [attempted to] take advantage of the nonperformance he has caused." *Zion's Properties*, 538 P.2d at 1321.

Here, the purchase and conveyance of land was the essence of the Contract. White Pine had paid for the Roadway and Lot 6 by the end of June 1984. Sharps contend White Pine was in default when it failed to pay taxes in November 1984. However, Sharps had a duty to convey the Roadway and Lot 6 in June. Thus, their refusal to convey constituted a substantial breach of the Contract, impairing White Pine's ability to continue making installment payments on the unplatted property, thus justifying abandonment of the Contract.

▄▄▄ We hold that the court erred in holding White Pine liable for unpaid installment payments on the unplatted property. Likewise, we hold that White Pine has no right to property for which it has not paid, nor does it have a liability to pay taxes on such property, as we further discuss in the next section.[4]

---

4. White Pine argues that its obligation to pay interest and installment payments should be

tolled. Our holding that White Pine is not entitled to the unplatted property and that it is not

## VI. UNPLATTED 7.35 ACRES

█ White Pine challenges the trial court's conclusion that it was not entitled to release of 7.35 acres of unplatted property. While White Pine's brief is not explicit, its claim seems to be that Sharps' duty to release 5.35 acres arose when it paid the June 30, 1984 installment because the principal portion of this payment exceeded the amount needed to release Lot 6. White Pine claims it then became equitably entitled to two more acres when it paid $59,-709.47 as part of the June 30, 1985 installment. Six months earlier, White Pine had failed to pay taxes on the unplatted property, which taxes became due November 30, 1984.

The Closing Memorandum provides that "after recordation of the PUD Plat and the Declaration of Covenants, Conditions and Restrictions, and upon receipt of each $140,000.00 in principal ... Seller shall execute and deliver to Buyer a Partial Deed of Reconveyance for one (1) PUD lot." The next paragraph provides that "[u]pon the payment of the release price, Buyer shall be entitled to the release of one (1) lot of Buyer's choice upon receipt of the payment or at any time thereafter."

The court's findings, which we have already affirmed, *Saunders v. Sharp*, 793 P.2d 927, 931 (Utah App.1990), reveal that: White Pine paid only $59,709.47 of the 1985 installment; it did not pay any of the final 1986 installment; and, White Pine did not request the 7.35 acre parcel until February 27, 1986, "despite the provision in [the Closing Memorandum] for the release by the Sharps of 'PUD lots' only." The court found that as of the date of the request, White Pine was still in default for the 1984 and 1985 property taxes and a portion of the 1985 installment and the full 1986 installment.

The court made no finding as to what portion of the 1985 partial payment was principal and what portion was interest.

More importantly, the Closing Memorandum requires that White Pine must have paid $140,000.00 in principle above that

obligated to pay installments, interest or taxes

which was already paid for Lot 6 in order to be equitably entitled to an additional PUD unit from the unplatted property. Our examination of the findings and the record reveals that White Pine had not done so.

Thus, the court correctly concluded that White Pine was not entitled to any portions of the unplatted property.

## VII. THE ROADWAY

The district court concluded that the Contract provides that White Pine should give Sharps access via the Roadway to any unreleased and unpaid for land as security in case of default by White Pine. The court also concluded that the parties modified the Contract to provide that owners and purchasers of the unplatted acreage, including Sharps and their successors in interest, would be entitled to use the Roadway for access to the unplatted property. The court concluded that this modification was "memorialized by the letters of Heaton and Felton and evidenced by the part performance and reliance of the Sharps on such letters and agreement in executing the Consent to Record." In the alternative, the court held that the Consent to Record in effect conveyed the Roadway in compliance with the modification.

White Pine claims the court's conclusions constitute legal error because the Contract unambiguously created a duty for Sharps to release the Roadway in fee simple to White Pine. White Pine argues that Sharps cannot meet this requirement to release through the creation of an easement or through the Consent to Record. White Pine also claims the court erred in concluding that the parties had modified the Contract.

The Closing Memorandum reveals that White Pine had paid Sharps $620,000.00. The document provides, with our emphases, that upon payment of this sum, and upon "the recordation of the PUD Plat and Declaration of Covenants, Conditions and Restrictions with the Summit County Recorder, [White Pine] shall be entitled to the

on this property disposes of this issue.

release from the Deed of Trust of three (3) PUD lots of Buyer's choice *together with the said roadway.*" The Closing Memorandum expressly provides that it "may not be orally changed, modified, or terminated, *except in writing,* by the party against whom the same is sought to be enforced."

■■ The plain language of the Closing Memorandum [5] unambiguously establishes that White Pine's equitable interest in the Roadway vested on July 16, 1981, the date it tendered the $620,000.00. As we earlier discussed, the recording of the specified documents was a condition precedent to the trustee's execution of the release, but did not affect White Pine's vested interest. *Burroughs v. Garner,* 43 Md.App. 302, 405 A.2d 301, 308–09 (1979). Because White Pine's vested interest in the Roadway arose July 16, 1981, the date of the execution of the Closing Memorandum, its right to receive the Roadway would survive any modification or subsequent breach. Given that the release could not be practically be realized until after December 23, 1983, the date the plat and the Covenants were filed, the *Burroughs* case would allow for the right to vest even though the land had not yet been platted. Thus the district court erred in concluding that the parties subsequently modified the Contract regarding the Roadway. We therefore reverse that conclusion.

## VIII. BENEFIT OF THE BARGAIN DAMAGES

White Pine challenges the district court's refusal to award benefit of the bargain damages. Specifically, White Pine claims it is entitled to the difference between the purchase price of the property that should have been released and the fair market value as of the date of Sharps' wrongful refusal to release.

■■ In awarding damages for breach of contract, courts attempt to place the nonbreaching party in as good a position as if the contract had been performed. *Alexander v. Brown,* 646 P.2d 692, 695 (Utah 1982); *Keller v. Deseret Mortuary Co.,* 23 Utah 2d 1, 455 P.2d 197, 198 (1969). Where the contract contemplates timely payment of installments and timely releases, the court, by attempting to "enforce the contract as written, . . . will attempt to place the parties in the position they would have been in had the contract been performed in a timely manner." *Dillingham Commercial Co. v. Spears,* 641 P.2d 1, 10 (Alaska 1982).

■■ Thus, when specific performance is in order, the buyer may be entitled to an award of lost rents or profits, while the seller may be entitled to interest on the purchase money withheld by the purchaser. *Eliason v. Watts,* 615 P.2d 427, 431 (Utah 1980) (citing *Pearce v. Third Ave. Improvement Co.,* 128 So. 396 (Ala.1930)).

■■ Here, the district court found that White Pine's damages were "too remote, conjectural and speculative," and that White Pine "failed to establish it [has] suffered actual damages resulting from any alleged breach by [Sharps]."

This is a finding of fact, which we have previously affirmed. *Saunders v. Sharp,* 793 P.2d 927, 931 (Utah App.1990). Likewise, we have already affirmed the finding that Sharps did not interfere with White Pine's possession of the property. *Id.* Given these findings, there is no basis for a conclusion that White Pine sustained benefit of the bargain damages. Thus, the court correctly declined to make such a conclusion.

## IX. CONSTRUCTION INTEREST

White Pine claims the court erred in refusing to admit evidence of the amount of interest paid to the mortgage company for construction loans for improvements on the

---

5. Language in the plat, the Consent to Record and the Covenants recorded on December 23, 1983, also supports the conclusion that White Pine's equitable interest in the Roadway vested when it tendered the $620,000.00. That is, the plat indicated that the internal Roadway was to be private, and the Covenants provided that easements over the lots and common area properties "are hereby reserved by Declarant [White Pine], together with the right to grant and transfer the same."

property. White Pine obtained these loans after the parties executed the Contract.

During trial, Sharps objected to the admission of evidence going to interest on construction loans. The court, relying on *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620 (Utah 1979) sustained the objection, presumably because it found the evidence to be irrelevant.

■ The trial court's construction of *Ranch Homes* and its attendant decision to bar admission of the evidence present questions of law which we review for correctness. *Grayson Roper Ltd. Partnership v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); *City of W. Jordan v. Retirement Bd.*, 767 P.2d 530, 532 (Utah 1988).

In *Ranch Homes*, the developers purchased an option to buy thirty acres of real property. *Ranch Homes*, 592 P.2d at 622. After the developers exercised the option, the sellers repudiated the terms of the option. The Utah Supreme Court reversed the trial court's award of damages incurred by the developers prior to their exercise of the option. *Id.* at 625–26.

Special damages are "those damages which arise from the special circumstances of the case. They have been said to be such damages as, by competent evidence, are directly traceable to failure to discharge a contractual obligation." *Id.* at 624 (footnote omitted). The supreme court emphasized that special damages must be foreseeable at the time of contracting. *Id.* "Mere knowledge of possible harm is not enough; the defendant must have reason to foresee, as a probable result of the breach, the damages claimed. Furthermore, before reliance damages may be awarded, the amount of the expenditure must be found to have been *reasonably made.*" *Id.*

■ In the present case, our ruling that White Pine has a vested interest in Lot 6 but no interest in the unplatted property, along with our affirmance of the court's finding that Sharps did not interfere with White Pine's efforts to market the property, renders the evidence irrelevant. That is, White Pine's expenditures for construction interest on land it is entitled to cannot be considered damages. On the other hand, White Pine's expenditures for land it does not own and is not entitled to is too speculative to be recoverable, especially since it elected to cease making payments toward that property.

We therefore hold that the court correctly concluded that evidence of interest paid for construction loans for improvements on the property was irrelevant.

## X. ATTORNEY FEES AND COSTS

Each party claims it is contractually entitled to attorney fees at trial and on appeal. White Pine claims the trial court erred as a matter of law in awarding Sharps attorney fees because they breached the Contract. White Pine asserts its contractual right to an award of attorney fees incurred at trial and on appeal.

On the other hand, Sharps claim the court correctly awarded attorney fees. They ask this court to affirm their award and to award them additional fees on appeal.

While courts may, in some situations, award attorney fees on an equitable basis, "attorneys fees, when awarded as allowed by law, are awarded as a matter of legal right." *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985).

One such instance occurs when the right is contractual.[6] In such cases, " 'the court does not possess the same equitable discretion to deny attorney's fees that it has when fashioning equitable remedies, or applying a statute which allows the discretionary award of such fees.' " *Cobabe v. Crawford*, 780 P.2d 834, 836 (Utah App. 1989) (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 226 (5th Cir.1975)).

■ Thus, "[p]rovisions in written contracts providing for payment of attorney fees should ordinarily be honored by the

---

6. Utah has a statute providing that contractual claims for attorney fees be reciprocal in nature. However, this section, Utah Code Ann. § 78–27– 56.5, enacted in 1986, is inapplicable here because the contract was executed in 1981.

courts." *Stacey Properties v. Wixen,* 766 P.2d 1080, 1085 (Utah App.1988), *cert. denied,* 779 P.2d 688 (Utah 1989) (quoting *Soffe v. Ridd,* 659 P.2d 1082, 1085 (Utah 1983)). This includes attorney fees incurred on appeal. *Management Servs. Corp. v. Development Assocs.,* 617 P.2d 406, 408–09 (Utah 1980); *accord Redevelopment Agency v. Daskalas,* 785 P.2d 1112, 1126 (Utah App.1989) *cert. granted,* 795 P.2d 1138 (Utah 1990).

It also includes attorney fees incurred to seek specific performance. *Hackford v. Snow,* 657 P.2d 1271, 1277 (Utah 1982); *Jones v. Hinkle,* 611 P.2d 733, 736 (Utah 1980); *Carr v. Enoch Smith Co.,* 781 P.2d 1292, 1296 (Utah App.1989).

Here, the Contract provision sought to be enforced is part of the Closing Memorandum:

> In the event of breach or default of any obligation under this memorandum the defaulting party shall pay all expenses of enforcing the same or any right arising out of breach or default thereof, including reasonable attorneys' fees, whether incurred with or without suit and both before and after judgment.

Thus, the Contract provides that the defaulting party pay all expenses of enforcement of a breach or default. Here, both parties have defaulted. Thus, each defaulting party must pay reasonable attorney fees associated with enforcing each default, including "any right arising out of breach or default thereof."

■ Neither party disputes that White Pine failed to timely pay taxes on Lots 1 to 6 and the Roadway. However, the dispute arose over the proper remedy for failure to pay taxes and installments. Because we conclude today that Sharps improperly refused to reconvey Lot 6 and the Roadway, we likewise conclude that Sharps may not collect attorney fees for seeking a remedy that is not a "right arising out of breach or default thereof."

■ However, Sharps' pursuit of White Pine for unpaid taxes on Lots 1 to 6 and the Roadway is a right arising out of the Contract. Thus Sharps are entitled to reasonable attorney fees expended in seeking those payments. Again, those attorney fees should not include those fees expended in defending their refusal to reconvey Lot 6 and the Roadway.

■ Likewise, White Pine's suit for specific performance is a right arising from Sharps' breach. We remand for the court to determine a reasonable attorney fee to be paid by Sharps for amounts reasonably incurred by White Pine at trial and on appeal on the issues on which it prevailed in accordance with this opinion. We also remand for the court to determine a reasonable attorney fee incurred by Sharps in pursuing White Pine for unpaid taxes on Lots 1 to 6 and the Roadway.

## XI. TEMPORARY RESTRAINING ORDER

■ White Pine claims the court acted within its discretion in issuing the September 1986 TRO preventing a trustee's sale of Lot 6, the Roadway and all of the unplatted property.

Sharps claim the TRO constituted an abuse of discretion because White Pine materially breached the Contract, and because Sharps did not breach.

Because we have determined that White Pine is entitled to the release of Lot 6 and the Roadway, we affirm the restraining order until such time as Sharps have executed the releases in accordance with this opinion and with the directions of the trial court on remand.

## CONCLUSION

To sum up our disposition of this complicated case, (1) we conclude the Contract is not ambiguous as it pertains to the issues discussed herein; (2) we reaffirm the trial court's findings relating to White Pine's obligation to pay property taxes on Lots 1 to 6 and the Roadway; (3) we reverse the court's conclusion regarding Sharp's duty to release Lot 6 and remand for the court to order its release pursuant to the Contract and in accordance with this opinion; (4) we reverse the court's conclusion that White Pine is liable for unpaid installment payments and interest thereon; (5) we affirm the court's conclusion that White Pine

has no right to conveyance of the unplatted property; (6) we reverse the court's conclusion regarding White Pine's liability for taxes on the unplatted property; (7) we reverse the court's conclusion that the parties subsequently modified the Contract regarding the Roadway; (8) we remand for the trial court to order Sharps to convey the Roadway; (9) we affirm the court's conclusion that White Pine is not entitled to benefit of the bargain damages; (10) we affirm the court's conclusion that evidence of construction interest is irrelevant; (11) we remand for the court to determine a reasonable attorney fee to be paid by Sharps for amounts reasonably incurred by White Pine at trial and on appeal as a result of White Pine's suit for specific performance of the release of Lot 6 and the Roadway and for other amounts reasonably expended in enforcing the Contract "or any right arising out of breach or default thereof"; (12) we remand for the court to determine a reasonable attorney fee incurred by Sharps in pursuing White Pine for unpaid taxes on Lots 1 to 6 and the Roadway; and (13) we affirm the restraining order barring Sharps from disposing of the property.

JACKSON, J., concurs.

ORME, J., concurs, except that as to section VIII I concur only in the result.